SCHOOL COMMITTEE OF NEW BEDFORD & others *vs.*
COMMISSIONER OF EDUCATION & another.

Bristol.   May 6, 20, 1965. — June 23, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Education. School and School Committee. Equity Jurisdiction,* Declara-
tory relief. *Equity Pleading and Practice,* Declaratory proceeding.
*Mandamus. Evidence,* Judicial notice. *Words,* "White."

A demurrer to the bill in a suit in equity for declaratory relief must be
overruled if the bill states a case for such relief.   [412]
A municipality and its school authorities had standing to maintain a suit
in equity against the State commissioner and board of education to
resolve a controversy as to the plaintiffs' duty to comply with a request
of the commissioner for a certain "racial census" in the municipality's
schools and as to the power of the defendants to withhold school aid
from the municipality for failure to comply with such request.   [412]
It would be within the power of the State commissioner of education
under G. L. c. 69, § 1, to require the school authorities of a municipality
to take a "racial census" in its schools for the purpose of furnishing to
the commissioner, prior to April 1, unsworn information merely as to
the number of "white" students and "non-white" students in each of
the municipality's schools, which would be relevant to racial problems
currently affecting the administration of public schools in Massachu-
setts [413]; and the duty of the municipality's school authorities to
furnish such information would be enforceable by mandamus, but a
failure to furnish it would not be ground for withholding State aid
from the municipality under c. 72, § 6 [414–415].
This court took judicial notice of racial problems currently affecting the
administration of public schools in Massachusetts, and of the relevance
to such problems of information about the racial composition of the
student bodies in the schools.   [416]

BILL IN EQUITY filed in the Superior Court on June 12,
1964.

The suit was heard by *Dewing,* J., on demurrer to the
bill.

*George Jacobs,* City Solicitor, for the plaintiffs.

*Lee H. Kozol,* Assistant Attorney General, for the de-
fendants.

CUTTER, J.   On June 12, 1964, the New Bedford school committee, the superintendent of schools, and the city brought this bill against the commissioner of education and the State board of education (see G. L. c. 15, § 1A, inserted by St. 1947, c. 652, § 2) seeking a declaration, among other things, (1) that the plaintiffs are not required to conduct a racial census in the New Bedford schools at the request of the commissioner, and (2) that the defendants may not, "as a result of the . . . [plaintiffs'] failure to take [such] a racial census," withhold any school aid to which New Bedford is entitled under G. L. c. 70.   The defendants' demurrer was sustained by interlocutory decree on July 21, 1964.   By the final decree entered September 28, 1964, the bill was dismissed.   The plaintiffs appealed from the interlocutory decree and the final decree.   The facts are stated as alleged in the bill.

On March 2, 1964, the commissioner in a letter to all chairmen of school committees and superintendents of schools, referred to current problems concerning the racial composition of the student bodies in the public schools. He enclosed simple school census forms to be returned before April 1, 1964, together with instructions.

On March 16, 1964, the school committee's secretary (the superintendent of schools) notified the commissioner by letter that the committee had voted to take no action on the commissioner's inquiry.   The commissioner on March 23 and on May 1, 1964, in writing repeated his request for compliance.   On May 11, 1964, a letter from the city's superintendent of schools informed the commissioner that the committee had voted that he be told that, if he wanted a census, he or his delegate "should come to New Bedford and conduct the census."   On May 21, 1964, the commissioner again wrote to the superintendent, inviting his attention to G. L. (Ter. Ed.) c. 72, § 2, and to an opinion of the Attorney General advising that "to the extent the . . . census . . . will be of assistance to the [c]ommissioner in the discharge of his duties, it must be furnished."

It is also alleged that the commissioner informed the superintendent that "New Bedford's non-compliance with

the request for a racial census has placed New Bedford in jeopardy of losing the school aid from the Commonwealth . . . to which it is entitled under'' G. L. c. 70; that the defendants have not furnished any criterion by which to conduct a racial census; that ''the racial composition of the public school population of New Bedford does not lend itself to the drawing of a . . . realistic distinction between 'white' and 'non-white' students'';[1] and that the proposed ''racial census . . . could serve no useful educational purpose.'' In the bill it also is asserted that on various legal grounds the census is not authorized by law.

1. There was no basis for filing a demurrer and it was error to sustain it. The plaintiffs stated a case entitling them to a declaration of rights. *Trustees of Reservations v. Stockbridge,* 348 Mass. 511, 513, and cases cited. The plaintiffs had standing to seek declaratory relief in interpreting the statutes applicable to their duties as to which a controversy had arisen. See *Metropolitan Dist. Police Relief Assn. Inc. v. Commissioner of Ins.* 347 Mass. 686, 689. Cf. *Nantucket Boat, Inc. v. Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 345 Mass. 551, 553; *Bob Ware's Food Shops, Inc. v. Brookline, ante,* 385, 388.

It may be that the bill states with substantial accuracy the relevant facts. That, however, cannot be determined in advance of the filing of the defendants' answers and trial on the merits. Thus we do not afford declaratory relief finally on this record. Nevertheless, because it will hasten the conclusion of this public controversy, we state briefly certain applicable principles of law. See *Wellesley College v. Attorney Gen.* 313 Mass. 722, 731.

2. The commissioner is given ''supervision of all educational work supported in whole or in part by the [C]ommonwealth.'' He is charged with suggesting ''improve-

---

[1] The commissioner outlined procedures for taking the census in considerable detail. The form asked for relatively simple information, giving only totals for each school (and seeking no ''information as it relates to an individual'') on the following five items, (a) name of school, (b) grades (i.e. the grades included in each building), (c) number of ''white'' students, (d) number of ''non-white'' students, and (e) totals.

ments in the present system . . . to the [G]eneral [C]ourt'' and with collecting ''information relative to the condition of the public schools.'' G. L. c. 69, § 1.

General Laws c. 72, § 2, requires the school committee of each city or town (see G. L. c. 4 § 7, Thirty-fourth) to ''record the names, ages and such other information as may be required by the department . . . of all minors residing therein between five and sixteen, and of all minors over sixteen who do not meet the requirements for the completion of the sixth grade.'' This information alone, of course, would almost certainly not cover the census sought by the commissioner which extended through the high school grades (i.e. from kindergarten through grade twelve, which usually includes persons over sixteen).

General Laws c. 72, § 3 (as amended through St. 1939, c. 461, § 2), provides, ''The superintendent of schools shall annually on or before July thirty-first transmit the school returns to the commissioner, signed and sworn to by him, containing the following information, *together with any other information required by the commissioner in accordance with*'' c. 69, § 1 (emphasis supplied). Then follows a list of items of required information (not inclusive enough to cover the census). These items were probably largely designed (a) to enable the commissioner to prepare general school statistics, and (b) together with any returns filed under G. L. c. 70, § 9 (as amended through St. 1956, c. 599, § 3), to assist in applying the school aid formula contained in c. 70, § 4 (as amended through St. 1953, c. 547, § 1). See c. 70, § 3 (as amended through St. 1956, c. 599, § 2).

These statutory provisions do not provide as clearly as would be desirable the procedure by which the commissioner is to gather needed information, other than the information specified in detail in c. 72, § 3, as to be included in the annual return. Nevertheless, we think that, in the aggregate, the statutory provisions authorize the commissioner, acting reasonably, to compel the production of information of the general character now sought.

The enumeration and grant of the commissioner's powers and duties in G. L. c. 69 by implication give to him a substantial range of incidental authority to do in an ordinary and reasonable manner those things required for the efficient exercise of the powers and the satisfactory performance of the duties. See *Lynch* v. *Commissioner of Education,* 317 Mass. 73, 79–80; *Scannell* v. *State Ballot Law Commn.* 324 Mass. 494, 501–502; *Bureau of Old Age Assistance* v. *Commissioner of Pub. Welfare,* 326 Mass. 121, 124. The statutes (especially c. 72, § 3) sufficiently express a legislative intention that the commissioner shall have power to compel the production of reasonable information by the cities and towns relevant to education in the cities and towns and to pending educational problems of the department.

We assume that the commissioner, in submitting the census form, was seeking information pursuant to his powers under c. 69, § 1. He seems in his brief also to rely to some extent upon the mandate of the first sentence of c. 72, § 3, already quoted.

Matter included in the school return called for by § 3 is required to be sworn to by the superintendent. Nothing in c. 69, § 1, specifies that information under that section must be furnished under oath. We think, however, that the commissioner, acting under c. 69, § 1, and c. 72, § 3, may require reasonable information (in addition to that specified in § 3 as to be included in the return) to be included in the return and sworn to as part of the return.

The census form attached to the bill, however, contained no space for a jurat. No requirement of an oath was indicated. It was requested that the report be filed "on or before April 1, 1964," four months before July 31, 1964, when the 1964 annual return was to be filed in accordance with G. L. c. 72, § 3. Consequently, we assume that the commissioner was not asking for inclusion of the census material in the annual return under § 3.

We have no doubt (a) that the commissioner has power to require relevant, unsworn information, reasonably re-

quired by him, to be filed by local school authorities separately from the annual return, or (b) that the production of such separate information may be enforced by mandamus. See *Johnson* v. *District Atty. for the No. Dist.* 342 Mass. 212, 215; *Moran* v. *Secretary of the Commonwealth,* 347 Mass. 500, 504–505, and cases cited. We would not regard such separate, unsworn information, however, as part of the annual return, at least in the absence of a clear direction by the commissioner that it be included in the return. No allegation of such a direction appears in the bill.

The provisions for witholding State aid contained in G. L. c. 72, § 6 (as amended through St. 1962, c. 410), because of a city's failure to file "the returns and the report required by law" (see c. 72, § 5) appear to refer to the annual report of the school committee (see c. 72, § 4, required to be filed with the commissioner each year by April 30) and to the formal returns (and additional material) called for by c. 72, § 3. If, at the hearing on the merits, the racial census is found not to have been required as a part of the formal annual returns under § 3, the sanction contained in § 6 cannot be applied to the city for failure to file the census reports. In the absence of a more explicit statutory provision, we do not interpret the provisions of § 6 as applicable to the failure of a city or town to file unsworn information called for under c. 69, § 1, and not expressly requested as a part of the annual returns.

The city contends that no adequate standards for classifying students as "white" and "non-white" are laid down in the request for a racial census. We recognize the difficulties which may arise in particular cases, particularly in communities with a heterogeneous population. These terms, however, seem to us reasonably susceptible of application by school superintendents and teachers for the present general purposes. We need not now consider any difficulties inherent in applying these terms as to individuals, covered by such a census, for other purposes.

The classification is one which the courts and the bureau

of the census have found it practical to apply in New Bedford and elsewhere.[2] Even difficult border-line cases, for practical purposes can probably be solved on the basis of appearances without making this census inadequate in any substantial respect. Reasonable accuracy should be possible for a school committee, school officers, and teachers who are not reluctant to coöperate with the commissioner by furnishing him with information to which he is entitled by statute. The correspondence attached to the bill strongly suggests such reluctance on the part of the school committee.

The allegations of fact (as opposed to conclusions) in the bill do not indicate that the commissioner is acting under any improper delegation of legislative authority. At most, he is collecting information from public officials in matters pertinent to his and their defined duties and pursuant to statutory authority. He has not undertaken to determine legislative policy or to take any action affecting the interests of any individual. A broader and less explicit statutory delegation was upheld in *Lynch* v. *Commissioner of Educ.* 317 Mass 73, 79–83. See *Yakus* v. *United States*, 321 U. S. 414, 424–425.

The relevance of the information sought cannot reasonably be questioned. We take judicial notice of the fact that controversial racial problems currently affect the administration of public schools, even in Massachusetts, and that information about the racial composition of student bodies may be of value to the department's work. See e.g. the situation discussed in *Barksdale* v. *Springfield Sch. Comm.* 237 F. Supp. 543 (D. Mass.). The solution of these problems doubtless will be assisted by the dispas-

---

[2] A similar count seems to have been taken successfully in Springfield. See *Barksdale* v. *Springfield Sch. Comm.* 237 F. Supp 543, 545 (D. Mass.). In other contexts, there has been reasonable and practical interpretation of the term "white," as a word "of common speech, to be interpreted in accordance with the understanding of the common man." *United States* v. *Thind,* 261 U. S. 204, 206–215. See *Wadia* v. *United States,* 101 F. 2d 7, 8–9 (2d Cir.); *Beardsley* v. *Selectmen of Bridgeport,* 53 Conn. 489, 492; Statistical Abstract of the United States, 1964 (U. S. Dept. of Commerce), pp. 2, 18 (containing New Bedford census figures on a total and "non-white" basis). Cf. *Morrison* v. *California,* 291 U. S. 82, 85, 94–95.

sionate consideration of all relevant facts, some of which can be obtained only from local school authorities.

No facts alleged show any violation of G. L. c. 151C, § 2 (c), as amended by St. 1956, c. 334, § 3. Section 2 (c) has no application to a general official statistical inquiry of this type.

3. The interlocutory and final decrees are reversed and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*