SCHOOL COMMITTEE OF BOSTON *vs.* BOARD OF EDUCATION & another.

Suffolk.    May 4, 1967. — June 9, 1967.

Present: WILKINS, C.J., SPALDING, KIRK, SPIEGEL, & REARDON, JJ.

*Education. School and School Committee. Racial Imbalance Law. Constitutional Law,* Due process of law, Equal protection of laws, Legislative finding, Presumption of constitutionality, Racial imbalance. *Equity Jurisdiction,* Declaratory relief. *Words,* "Racial imbalance."

This court as a matter of discretion expressed its views in a suit in equity under G. L. c. 231A brought by a school committee to settle a controversy between it and the Board of Education and Commissioner of Education as to the constitutionality of St. 1965, c. 641, providing "for the elimination of racial imbalance in the public schools."    [697]

A contention that the racial imbalance act, St. 1965, c. 641, denies due process of law in that it is vague by reason of failure to furnish criteria to aid in classifying students in public schools as white or nonwhite was without merit.    [697]

There was no merit in a contention that § 37D of G. L. c. 71, inserted by § 1 of the racial imbalance act, St. 1965, c. 641, denies due process of law in that it is vague by reason of the statement therein that the "term 'racial imbalance' refers to a ratio between nonwhite and other students in public schools which is sharply out of balance with the racial composition of the society in which nonwhite children study, serve and work"; such statement must be read with the definitive declaration in the following sentence that "For the purpose of this section, racial imbalance shall be deemed to exist when the per cent of nonwhite students in any public school is in excess of fifty per cent of the total number of students in such school."    [697–698]

A finding by the Legislature that an emergency existed because of racial imbalance in the public schools was not open to judicial reëxamination.    [698]

A statute is presumed to be valid, and when its constitutionality is attacked, the burden is on the party attacking it to show that it cannot be supported on any reasonably conceived basis of fact. [699]

St. 1965, c. 641, providing for the elimination of racial imbalance in the public schools, was not shown to deny equal protection of the laws in a suit in equity for a declaratory decree as to its constitutionality in which it did not appear that in fact any pupil had been excluded from a public school on account of race. [700]

St. 1965, c. 641, does not deny due process of law by reason of its failure to grant a hearing to the school committee on a plan proposed by it to eliminate racial imbalance in a public school which the Board of Education has found to be racially imbalanced, or on the board's action on the plan. [700–701]

BILL IN EQUITY filed in the Superior Court on September 26, 1966.

The suit was reported by *Macaulay, J.*

*John W. White,* Special Assistant Corporation Counsel (*Philander S. Ratzkoff & William A. Cotter, Jr.,* with him), for the plaintiff.

*Elliot L. Richardson,* Attorney General (*Howard M. Miller,* Assistant Attorney General, *Edward J. Barshak,* Special Assistant Attorney General, *& William G. Buss, Jr.,* with him), for the defendants.

*Reuben Goodman, Steven Cohen, Herbert Hershfang & Lawrence D. Shubow,* for American Jewish Congress & others, amici curiae, submitted a brief.

WILKINS, C.J. This bill for declaratory relief under G. L. c. 231A is brought to settle a controversy between the plaintiff school committee and the defendants Board of Education and Commissioner of Education, G. L. c. 15, §§ 1E, 1F (as amended through St. 1966, c. 251, § 1, and St. 1966, c. 549, respectively), as to the constitutionality of St. 1965, c. 641, entitled "An Act providing for the elimination of racial imbalance in the public schools," which inserted §§ 37C and 37D in G. L. c. 71, and §§ 1I, 1J, and 1K in G. L. c. 15. The case is reserved and reported without decision by a judge of the Superior Court upon the pleadings, evidence, and findings of fact,[1] such decree to be entered as justice and equity may require. G. L. c. 214, § 31.

---

[1] The case was tried with a petition by the school committee under G. L. c. 15, § 1J, for judicial review of (1) the board's disapproval of a plan submitted by the committee and (2) the board's recommendations to the commit-

The racial imbalance act requires the school committee of every municipality annually to submit statistics showing the percentage of nonwhite pupils in all public schools and in each school. Whenever the board finds that racial imbalance exists in a public school, it shall give written notice to the appropriate school committee, which shall prepare a plan to eliminate imbalance and file a copy with the board. "The term 'racial imbalance' refers to a ratio between nonwhite and other students in public schools which is sharply out of balance with the racial composition of the society in which nonwhite children study, serve and work. For the purpose of this section, racial imbalance shall be deemed to exist when the per cent of nonwhite students in any public school is in excess of fifty per cent of the total number of students in such school." The plan must "detail the changes in existing school attendance districts, the location of proposed school sites, the proposed additions to existing school buildings, and other methods for the elimination of racial imbalance." The plan must consider the safety of the children and may provide for voluntary coöperation with other cities and towns. No committee as part of its plan may be required to transport any pupil outside his school district if the pupil's parent or guardian objects in writing. (G. L. c. 71, § 37D.)

The board shall provide technical and other assistance in the formulation and execution of plans. If a committee does not show progress within a reasonable time in eliminating imbalance, the commissioner may order State aid funds withheld until an acceptable plan has been received. (G. L. c. 15, § 1I).

If a committee declines to accept recommendations sub-

tee. The trial judge's findings were unfavorable to the board, to which he remanded the matter. The board appealed, but the case became moot when the board approved a new plan submitted by the committee, and waived its appeal. The findings in the case for judicial review are incorporated by reference in the report in the case at bar. A demurrer to the bill by the defendants was overruled by an interlocutory decree. This ruling is not expressly reported, and is not argued by the defendants. In any event, as we are deciding the merits, we affirm that decree. See *Travers* v. *Grossman,* *ante,* 182, 185.

mitted by the board, or the board disapproves a revised plan, the committee may seek judicial review. The court may affirm the determination of the board and order compliance, or it may find that the determination of the board is in excess of its authority, or based on error of law, or an abuse of discretion. (G. L. c. 15, § 1J.)

We summarize pertinent events in Boston beginning in October, 1965. The committee and the superintendent of schools then furnished the required statistics, which disclosed that twenty-five per cent of public elementary school students attended thirty-eight racially imbalanced schools. On the basis of the statistics the commissioner notified the committee that racial imbalance existed in certain schools. The committee filed with the board a plan to eliminate racial imbalance which the board deemed inadequate. At the committee's request the board pursuant to G. L. c. 15, § 1I, provided technical and other assistance, in the form of a "Task Force,"[1] to aid in the formulation and execution of plans to eliminate racial imbalance.

The committee first submitted a plan to eliminate imbalance to the board on December 22, 1965. This was rejected. A revised plan, submitted on June 13, 1966, was rejected on June 28, 1966, with a detailed analysis of the committee's plan and with the board's recommendations for compliance. On July 7, 1966, the committee resubmitted its original plan, and brought the present suit and the companion case, which were heard together in the Superior Court. See, *ante,* pp 694–695, fn. 1. On February 28, 1967, the committee submitted a new plan, which was accepted by the board on March 15.

The committee attacks the racial imbalance act as unconstitutional on its face in various respects.

1. We first consider whether the committee has standing to raise these questions. The defendants do not contend otherwise but in their brief express the hope that the con-

---

[1] This consisted of members of the staff of the Department of Education, educators from Harvard and Boston University, and the chief of the psychiatric division of the United States Veterans Hospital.

stitutional issues will be decided.  Cases like *Assessors of Haverhill* v. *New England Tel. & Tel. Co.* 332 Mass. 357, 362, and *Quinn* v. *School Comm. of Plymouth,* 332 Mass. 410, 413, were not proceedings for declaratory relief under G. L. c. 231A.  A recent case involving declaratory relief closely resembles the present case.  In *School Comm. of New Bedford* v. *Commissioner of Educ.* 349 Mass. 410, 412, the school committee sought a declaration as to whether the commissioner could compel it to take a racial census in the public schools.  The committee was held to have standing.  There was no contention of unconstitutionality.

We are of opinion that in this declaratory proceeding involving questions of pressing public importance we should indicate our views where a vista of avoidable litigation among administrative officials is disclosed and the issues have been fully argued.  This is a discretionary matter for the court.

2.  The committee argues that because of vagueness the racial imbalance act violates the due process clause of the Fourteenth Amendment and arts. 1, 10, 11, and 30 of the Declaration of Rights.

The first objection on this ground is that no criteria are furnished to aid in classifying students as white and nonwhite.  In spite of the committee's protestations this subject was settled for present purposes by *School Comm. of New Bedford* v. *Commissioner of Educ.* 349 Mass. 410, 415–416, which upheld the census requirements of the commissioner.  The plaintiff committee's argument really drafts for double duty its argument with respect to equal protection, a subject which will be more fully considered, *infra,* pp. 698–700.

Another respect in which it is objected that the law is uncertain is the statement in c. 71, § 37D, that the term "racial imbalance" refers to a ratio between nonwhite and other students in public schools which is sharply out of balance with the "racial composition of the society in which nonwhite children study, serve and work."  This sentence is to be read with the one which immediately follows it.

Both are quoted, *supra,* p. 695.   The second sentence definitively declares that for the purpose of this section, racial imbalance shall be deemed to exist when the per cent of nonwhite students in a public school exceeds fifty per cent of the total.   This is a proper occasion for application of the principle that a statute should be construed, wherever possible, to avoid doubts as to constitutionality.   See *Worcester County Natl. Bank* v. *Commissioner of Banks,* 340 Mass. 695, 701, and cases cited.

3.   Another alleged ground of unconstitutionality is that the act violates the equal protection clause of the Fourteenth Amendment and art. 1 of the Declaration of Rights. These provisions will be considered together as presented. See *Sheridan* v. *Gardner,* 347 Mass. 8, 15.

It would be the height of irony if the racial imbalance act, enacted as it was with the laudable purpose of achieving equal educational opportunities,[1] should, by prescribing school pupil allocations based on race, founder on unsuspected shoals in the Fourteenth Amendment.

The statute has its foundation in a legislative finding that the Commonwealth is faced with an emergency because of racial imbalance in the public schools.   This fact, fundamental to the issue before us, is not open to judicial reëxamination.   *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 507.   *Massachusetts Commn. Against Discrimination* v. *Colangelo,* 344 Mass. 387, 393–394.   The purpose is within the constitutional powers of a State Legislature.   The heart of the matter is whether the means are reasonably related to the objective and hence are free of sound constitutional criticisms.

The committee seems bent on stifling the act before it has a fair chance to become fully operative.   The objections it makes are numerous and expressed with slight deference.

---

[1] Section 37C provides:  "It is hereby declared to be the policy of the commonwealth to encourage all school committees to adopt as educational objectives the promotion of racial balance and the correction of existing racial imbalance in the public schools.   The prevention or elimination of racial imbalance shall be an objective in all decisions involving the drawing or altering of school attendance lines and the selection of new school sites."

They are "bluntly" proclaimed as if the committee could by the force of its own word make the burden fall upon the "Commonwealth" to "establish a compelling justification" for the legislation. This tactic is diametrically at variance with long established rules. "All rational presumptions are made in favor of the validity of every legislative enactment. Enforcement is to be refused only when it is in manifest excess of legislative power. . . . It is only when a legislative finding cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it that a court is empowered to strike it down. . . . If the question is fairly debatable, courts cannot substitute their judgment for that of the Legislature." *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 138–139, and cases cited.

In resolving the issue of constitutionality it is no part of our function to assess the wisdom or to attempt to foretell the efficacy of the particular legislative plan. Some complaints are baleful predictions as to the effect of the act which are confidently asserted before precise results are known and before any individual or group has had the law unconstitutionally applied to them. We decline to follow the invitation to look ahead "twenty-five or fifty years from now" and by guesswork as of that time to discover "devastating implications." Still other objections are speculative prophesies and little more than expressions born of the hope that the statute will fail. Most of these points may be summarily dismissed as immaterial to the real issues.

We give an example typical of unacceptable committee contentions. "The Commonwealth has the burden of convincing the Court that other approaches not utilizing racial classifications are neither feasible nor appropriate for the achievement of the legislative objective. For aught that appears, a reasonable solution may be obtained by improving the quality of the teachers and of the educational facilities in an imbalanced school and by the adoption of special enrichment programs therein."

We are not impressed with the proclaimed conclusion of the committee which "can perceive no overriding legisla-

tive justification for enacting a quota system for non-whites,'' particularly when it is founded on its own self-serving judgment that the nonwhites will positively be excluded from particular schools because of color. Again we do not recognize the authority of the committee to veto the act because of its charges that ''there is no overriding justification for enacting a law embodying a racial classification which will result in such an invidious discrimination,'' and that the ''non-white quota restriction . . . [is] a subtle effort in part to cater to white prejudice and to deter an exodus of whites from the community by preventing too many Negroes from attending particular schools rather than . . . a truly objective effort to help the Negro.''

We are of opinion that it would be unprofitable to discuss the cases which are cited by the committee. None is particularly in point. We shall, however, mention one. Great store is laid by a quotation from *McLaughlin* v. *Florida,* 379 U. S. 184, 194, which contains a statement in substance to the effect that racial group classifications ''bear a far heavier burden of justification.'' The facts of that case are extremely remote from any educational subject matter, but have to do with a discriminatory statute making inter-racial cohabitation a crime. The statute in the case at bar, on the other hand, ''does not concern race except insofar as race correlates with proven deprivation of educational opportunity.'' *Springfield Sch. Comm.* v. *Barksdale,* 348 F. 2d 261, 266 (1st Cir.). See *Wanner* v. *County Sch. Bd. of Arlington County, Virginia,* 357 F. 2d 452, 454–456 (4th Cir.); *Morean* v. *Board of Educ. of Montclair,* 42 N. J. 237, 241–244.

Until a pupil has been in fact excluded from a public school on account of race, we are unimpressed with the argument that the act works a denial of equal protection. As appears from § 37D, the committee is not required to transport a pupil outside his neighborhood school district if his parent or guardian files a written objection.

4. The committee contends that the racial imbalance act violates the due process clause of the Fourteenth Amend-

ment and arts. 1, 10, and 12 of the Declaration of Rights in failing to grant it a hearing on its proposed plans and the board's action thereon. This contention we reject. A sufficient reason is that the committee has no personal or property rights involved. *Assessors of Haverhill* v. *New England Tel. & Tel. Co.* 332 Mass. 357, 360. *Trenton* v. *New Jersey,* 262 U. S. 182, 185–192. The committee has no rights to a hearing under the State Administrative Procedure Act. By G. L. c. 30A, § 1 (1) (as amended through St. 1966, c. 14, §§ 42, 79, and c. 497), and § 10, the hearing is provided only when "required by constitutional right or by any provision of the General Laws." See *Westland Housing Corp.* v. *Commissioner of Ins. ante,* 374, 380. No statute is suggested as being material, and there is no constitutional right. In *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491, 494–500, individual property rights were involved. The applicants were precluded "from the pursuit of a lawful vocation at places where they deem[ed] it advantageous for them to work" (p. 499). See *Massachusetts Medical Serv.* v. *Commissioner of Ins.* 344 Mass. 335, 339.

The present point falls within what was said in *Opinion of the Justices,* 332 Mass. 785, 787, "The General Court is the source of the authority of school committees and can limit or extend their powers and lay down rules for the government of the public schools."

5. The interlocutory decree is affirmed. A final decree is to enter declaring that the racial imbalance act, St. 1965, c. 641, is not in violation of the Fourteenth Amendment of the Constitution of the United States or of arts. 1, 10, 11, 12, and 30 of the Declaration of Rights of the Constitution of the Commonwealth.

*So ordered.*