School Committee of Springfield *v.* Board of Education.

SCHOOL COMMITTEE OF SPRINGFIELD *vs.* BOARD OF
EDUCATION
(and a companion case[1]).

Suffolk.    April 4, 1974. — May 1, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & WILKINS, JJ.

*Racial Imbalance Law. Education. School and School Com-*
*mittee. Equity Jurisdiction,* Review under racial imbalance
law. *Equity Pleading and Practice,* Parties. *Constitutional Law,*
Equal protection of laws, School segregation. *Words,* "Neighbor-
hood."

Substantial evidence warranted a conclusion by the State board of
education that a task force short-term racial balance plan for the
public schools of a city, adopted by the board and formulated after
consideration of travel and traffic problems, and reducing the
number of school districts, satisfied the safety and neighborhood
requirements of G. L. c. 71, § 37D. [221-223]
Under the decision of this court in *School Comm. of Springfield v. Board*
*of Educ.* 362 Mass. 417 (1972), that the committee, with the
assistance of the board, should develop measures consistent with
G. L. c. 71, § 37D, to "achieve racial balance in all [pub-
lic] ... schools of the city," the board properly rejected, as not
complying with the "filing" requirement of § 37D, a four-page plan
submitted by the committee which the committee had refused to
approve [223-225]; furthermore, the board properly rejected the plan
as substantively inadequate in that it dealt only with reassignment of
fifth and sixth grade students in imbalanced schools, omitted in-
depth consideration of safety requirements, and failed adequately to
spell out procedures for pupil assignment and district revision [225].
Substantial evidence supported a conclusion by the State board of
education and its hearing examiner that the board had met the
obligation imposed by G. L. c. 15, § 1I, to render to a school
committee "technical and other assistance in the formulation and

---

[1] The companion case is The Quality Integrated Education Committee *vs.*
Board of Education.

execution of plans to eliminate racial imbalance" in public schools by the time the examiner held hearings on a plan submitted by, but not approved by, the school committee, a plan of a task force, and a plan of an intervener [225-226]; there was no merit in a contention that before holding the hearings on the school committee's plan the board should have evaluated it, and, if disapproved, offered specific recommendations to the committee which would have made the plan acceptable [226-227].

There was no merit in contentions by the school committee of a city that it had not received sufficient notice of hearings to be conducted by the State board of education on plans which it informed the committee "were or will be submitted pursuant to G. L. c. 71, § 37D," for the elimination of racial imbalance in the public schools, and that the issues to be discussed at the hearings were not adequately defined, where it appeared that the hearings were begun pursuant to a notice issued fourteen days previously, and that the context in which the hearings arose made crystal clear the nature and purpose thereof. [227]

Failure of an "association of residents" of a city, plaintiffs in a suit in equity against the State board of education, to show either that the association itself would be harmed by enforcement of a task force plan for elimination of racial imbalance in the public schools adopted by the board and challenged by the association, or that it represented a class of persons who would be so harmed indicated a lack of standing to maintain the suit, and this court ordered entry of a final decree dismissing the bill. [229-230, 234]

In a suit in equity by an association of residents of a city against the State board of education, where there was lacking any proof that State or local school authorities intentionally acted so as to create a concentration of Puerto Rican students in some of the public schools, there would have been no basis for a finding that such concentration constituted de jure segregation in violation of the Fourteenth Amendment to the United States Constitution. [230-231]

With respect to a task force short-term plan to remedy racial imbalance in the public schools of Springfield which included no provision for balancing the ethnic composition of schools in a district where Puerto Rican students were concentrated, it was held by this court that the approval and adoption of the plan by the State board of education, and its "long-range" order that the school committee study methods whereby the "minority isolation" of that district could be ended, clearly indicated an intent to remedy existing racial imbalance, not to reinforce existing ethnic segregation, and that enforcement of the Massachusetts racial imbalance law by implementing the plan will not violate the rights of such students under the Fourteenth Amendment of the United States Constitution. [231-233]

A suit in equity was remanded by this court to the jurisdiction of the
county court to ensure implementation of a task force short-term plan
to remedy racial imbalance in the public schools of Springfield by
September, 1974. [233-234]

TWO BILLS IN EQUITY filed in the Superior Court on
November 12, 1973, and later transferred to the Supreme
Judicial Court for the county of Suffolk.

The suits were reserved and reported by *Hennessey*, J.

*William C. Flanagan* for the School Committee of
Springfield.

*Francis X. Spina* (*Robert D. Fleischner* with him) for the
Quality Integrated Education Committee.

*Sandra L. Lynch*, Assistant Attorney General, for the
Board of Education.

*Stephen W. Silverman*, for Hampden County Chapter of
Civil Liberties Union of Massachusetts, amicus curiae,
submitted a brief.

TAURO, C.J.    These cases bring before us for the second
time questions concerning the application of the Mas-
sachusetts racial imbalance law[2] to the city of Springfield
schools. We first considered the matter in *School Comm. of
Springfield* v. *Board of Educ.* 362 Mass. 417 (1972)[3]
(Springfield I). The present cases were brought separately
by the school committee and by The Quality Integrated
Education Committee (QIEC), an intervener in the admin-

---

[2] G. L. c. 15, §§ 1I-1K, and c. 71, §§ 37C, 37D.

[3] In that opinion, the court held that, "[i]nasmuch as Springfield has failed to
achieve racial balance in its elementary school system in the period since 1965, we
think it is reasonable to require that the school committee, with appropriate
assistance from the board, develop short-term measures consistent with G. L.
c. 71, § 37D, which will achieve racial balance in all city schools by September,
1973. With this end in view (see G. L. c. 71, § 37C), we remand the counterclaim
to the Superior Court with directions that, after hearing the parties, the court
establish a schedule for the submission of specific recommendations by the board,
for the filing of a short-term program by the school committee, and for final action
by the board, with sufficient time to allow for judicial review if required." *Id.*
at 444. "Regardless of any legal problems concerning Springfield's long-range
program to build new schools, the judge below must insist on development and
implementation of effective short-term measures by September, 1973. . . . In the
first instance, each local school committee must devise a racial balance plan, and
if the committee fails to accomplish the legislative objective then State author-
ities must recommend a satisfactory plan." *Id.* at 446-447.

istrative proceedings below, to obtain judicial review of an opinion and order entered by the State board of education (board) pursuant to its powers under G. L. c. 15, §§ 1I, 1J.

## Prior Proceedings.

After our remand of the prior case to the Superior Court, at a hearing on November 3, 1972, the judge found that the board, in compliance with our order, had submitted specific recommendations to the school committee and that the next step for the school committee was to file a short-term racial balance plan with the board. At the Superior Court hearing the school committee represented that a short-term racial plan would be filed with the board by the first part of 1973. On the strength of this the matter was continued by agreement.

By the spring of 1973, the school committee had not approved and submitted to the board any short-term plan and the board asked for a hearing in the Superior Court. On June 20, 1973, the Superior Court directed the school committee to file a short-term plan with the board immediately. A plan to balance only the fifth and sixth grades of the five imbalanced elementary schools was filed by the school committee with the board on June 29, 1973. Previous to filing, the school committee had not approved this plan for implementation.

An order of notice was issued on July 18, 1973, for hearings to begin on August 1, 1973. A hearing examiner was appointed by the board "for the purpose of conducting hearings on plans submitted to the Board by the Springfield School Committee and the staff of the Task Force on Racial Imbalance, which plans were or will be submitted pursuant to G. L. c. 71, § 37D."[4] During those

---

[4] The purpose for which plans were to be submitted was, of course, to effect compliance with our directive that the school committee "develop short-term measures consistent with G. L. c. 71, § 37D, which will achieve racial balance in

hearings, which began on August 1, 1973, and continued for nine days, the hearing examiner in fact considered three different plans: the plan submitted (but not approved) by the school committee which was designed to balance racially only the fifth and sixth grades of the imbalanced schools (the school committee plan); a plan submitted by the Task Force which would divide the city into six school districts and would achieve racial balance in all the schools (the Task Force plan); and a plan submitted by QIEC which would divide the city into five school districts and would achieve racial balance in all the schools (the QIEC plan). After lengthy hearings the hearing examiner issued a comprehensive and detailed "Report and Recommendations."

As to the school committee plan, the hearing examiner found that it was not properly before him both because it was not submitted in a timely fashion and because it had never been approved by the school committee. In addition, he found that, even if the plan were properly before him, it failed in several respects to satisfy the requirements of the racial imbalance law: most importantly, it did not racially balance the schools. As to the QIEC plan, the hearing examiner found that, while it satisfied the requirement of racial balance, it was deficient in several other respects, namely, it failed to fulfil safety requirements, it contained no evaluation of the need for additions to school buildings, and it proposed districts which showed no relation to existing neighborhoods. Finally, as to the Task Force plan, the hearing examiner concluded that it complied in every respect with the racial imbalance law and he recommended its adoption. He reached this conclusion after careful consideration of the details of the plan in light of the statutory standards.

After receipt of the school committee's and QIEC's

all city schools by September, 1973." *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. at 444 (1972). There were, and still are, five elementary schools in Springfield which are not racially balanced within the meaning of the statute.

objections, the board heard oral argument on the hearing examiner's report and recommendations. The board then issued its own opinion and order in which it considered and rejected each objection raised by the parties. The board approved and adopted, with slight modification, the Task Force plan and issued an order in which it established a timetable for implementation of the plan by the school committee.

The school committee on November 12, 1973, filed a bill for judicial review (G. L. c. 15, § 1J, and c. 30A, § 14), declaratory relief (G. L. c. 231A) and injunctive relief. Thereafter the board filed an answer and a counterclaim which sought enforcement of its opinion and order. The school committee then filed a demurrer and answer to the counterclaim. In November, 1973, QIEC filed a bill for judicial review (G. L. c. 30A, § 14), declaratory relief (G. L. c. 231A) and injunctive relief (G. L. c. 214, § 1, and c. 30A, § 14), to which the board filed an answer. On motion by the board, both cases were transferred to the county court where the cases were reserved and reported to the full court by a single justice of this court.

On December 24, 1973, a single justice of this court ordered the school committee "forthwith" to submit to the board an implementation plan for and proposed modifications to the Task Force plan in accordance with the board's order. The school committee appealed from and sought a stay of that order. On January 9, 1974, a single justice of this court denied the application for a stay. On January 28, 1974, a single justice of this court granted a petition by the board seeking a definite date for compliance by the school committee. Upon the committee's refusal to take the steps necessary to implement the plan according to the implementation schedule, a preliminary injunction was issued requiring implementation of the plan according to schedule.

### SCHOOL COMMITTEE'S OBJECTIONS.

The school committee raises a host of objections to the board's actions in this case. It first attacks the Task Force

plan as failing to meet the requirements of the racial imbalance act, and then contends that its own short-term plan involving the balancing of the fifth and sixth grades was adequate. Next, the committee focuses on what it perceives to be procedural errors surrounding the hearing which was convened on August 1, 1973. We consider the school committee's objections seriatim.

1. The school committee argues that the Task Force plan adopted by the board does not comply with the safety and neighborhood requirements of G. L. c. 71, § 37D. The scope of our inquiry into an issue of this sort has been clearly defined in *School Comm. of Boston* v. *Board of Educ.* 363 Mass. 125, 128-129 (1973): "The proper function of the court is not to engage in complex fact determinations more appropriately committed to an agency, with staff and skilled experience to make them. Rather, the court must accept the factual determinations made by the agency if it finds they are supported by substantial evidence." The question for decision, therefore, is not whether we believe the Task Force plan meets the safety and neighborhood requirements, but whether there was substantial evidence before the board to support its conclusion that the plan satisfies these two conditions. See *School Comm. of Boston* v. *Board of Educ.* 364 Mass. 199, 205 (1973).

The Task Force plan was designed by the superintendent of schools and the staff of the Springfield school department, with the assistance of the Task Force personnel. The record of the proceedings before the hearing examiner clearly indicates that thorough consideration was given to the question of pupil safety. The school department consulted with the police department, the bus company, the city planning department and the building department. The plan takes into account traffic flow, intersection locations, crime incidence in the city of Springfield, and travel time and distance involved in busing deemed essential. Trained bus monitors will be placed on buses likely to travel along hazardous routes. The children will be instructed as to bus conduct, and will be taught how to deal with possible emergencies. Guards will be stationed at

appropriate intersections. Approximately two-thirds of Springfield's post-kindergarten students will not be bused, and the kindergarten group is totally exempt. Where busing is required, the plan primarily involves fifth and sixth graders, and the maximum distance to be traveled is five miles, a distance which requires no more than twenty minutes actual travel time.

Thus, it is clear that there was substantial evidence to support the board's determination that the proposed plan is a safe one. While it is possible to point out certain claimed deficiencies in the Task Force plan with regard to safety, "[p]ractical experience and mutual assistance and coöperation by the parties should yield continuous refinement to assure maximum safety precautions. . . . [S]uch a need for refinement would be present in any plan of this type and does not invalidate the Board's current efforts. The Committee has pointed out no specific features of the plan which pose such egregious safety hazards that we could say that it is arbitrary or capricious or not in accordance with law." *School Comm. of Boston* v. *Bd. of Educ.* 364 Mass. at 206 (1973).

We also reject the committee's argument that the board's plan does not comply with the neighborhood requirement of the racial imbalance law. In the first *Springfield* case, we held that this aspect of the statute is satisfied so long as newly drawn school districts "bear a reasonable, though not necessarily a fixed, proximity to recognized neighborhoods." 362 Mass. at 439 (1972). Most recently, in *School Comm. of Boston* v. *Bd. of Educ.* 364 Mass. at 206 (1973), we emphasized that a fluid concept of the term "neighborhood" was necessary in order to avoid placing a "straitjacket on planning to eliminate racial imbalance and thus to frustrate the very purposes of the statute." The board's proposed Task Force plan clearly fits within this framework, and a finding that it conformed to the neighborhood district standard is supported by substantial evidence. The plan reduces the number of elementary school districts from thirty-six to six by combining small contiguous districts into larger ones. The new district

lines trace those of the currently existing districts. While this alteration obviously will result in significant expansion of the size of the existing districts, each new district, being composed of smaller preëxisting districts, will continue to be reasonably proximate to recognized neighborhoods within the city of Springfield. The hearing examiner, on the basis of the testimony of the plan's designer, as well as his own examination of the proposed plan in light of various ward, precinct, and neighborhood maps of Springfield, found that the Task Force plan was compatible with the city's neighborhood patterns. The board accepted and adopted that finding, and as we have indicated, there was substantial evidence to support its decision.

2. Under our decision in *Springfield I*, the school committee, with appropriate assistance from the board, was required to develop short-term measures consistent with G. L. c. 71, § 37D, which would achieve racial balance in all city schools by September, 1973. 362 Mass. at 444 (1972). We remanded the case to the Superior Court with instructions that it establish a timetable for committee compliance with our order. Thus, under the framework established by G. L. c. 71, § 37D, and *Springfield I*, the burden rested upon the school committee to "file" a plan to eliminate the racial imbalance found to exist in Springfield's elementary schools. Since the *Springfield I* decision, we noted in another context that short-term "partial solutions" to complex racial imbalance situations may be acceptable, so long as ongoing attention and effort are directed toward long-range solution to the problem. *School Comm. of Boston* v. *Board of Educ.* 363 Mass. at 131. In this setting, we now turn to the argument made by the school committee that a plan submitted by it on June 29, 1973, to the board, which was rejected, satisfied its obligations under G. L. c. 71, § 37D, and our decisions in this area.

On June 29, 1973, the school committee transmitted to the board a four-page document which proposed to eliminate racial imbalance only in the fifth and sixth grades of the elementary school system. The school committee re-

fused to approve the plan submitted to the board. This action was understood by the school committee to satisfy its obligation to "file" a plan to eliminate racial imbalance, and was viewed as an acceptable, partial solution to Springfield's imbalance problems. The board rejected the plan outright, stating that the mere submission of a plan without school committee approval did not meet the "filing" requirement of G. L. c. 71, § 37D, and the *Springfield I* decision, and that in any event, the proposed plan in its skeletal form did not, as matter of law, comply with the racial imbalance act or the mandates of the *Springfield I* case. We agree.

The school committee's view misconceives its obligations under the racial imbalance act, and invites potential dilatory tactics which are totally inconsistent with the paramount aim of bringing quality integrated education to Commonwealth school children as soon as possible. Under G. L. c. 71, § 37D, the school committee has the primary responsibility for devising a plan to eliminate racial imbalance in its school system. The school committee, not the board, possesses the first hand knowledge of the school system, and it has the resources and staff to deal more effectively with local problems. The board's role is to evaluate critically plans which are the product of sincere school committee efforts to meet its important responsibilities. A plan submitted without approval by a school committee is a clear indication that full effort and commitment has not been made toward developing a viable solution to the problem at hand. It is not the type of positive action contemplated by the structure of the racial imbalance act, and cannot be accepted as the plan that the school committee is required to submit for consideration of the board.

Moreover, such school committee action lays the groundwork for unnecessary and continuing judicial and administrative proceedings. Under the school committee's approach, resulting board action would be subject to challenge whether the board accepted or rejected the plan. If the board approved the plan, the school committee could

object, arguing that the plan, which it did not approve, fails to satisfy the requirements of the act. If the board rejected the plan, the committee could argue that the plan was a valid one.[5] The board was correct in rejecting a plan that did not have school committee approval.

The board also acted properly in ruling that the plan submitted by the school committee was substantively inadequate. Only four pages in length, the plan omits in-depth consideration of the safety requirements of G. L. c. 71, § 37D, and fails adequately to spell out procedures for pupil assignment and district revision. Most importantly, however, it deals only with fifth and sixth grade reassignment. The *Springfield I* decision specifically ordered the committee to devise a short-term measure which will "achieve racial balance in *all* city schools by September, 1973" (emphasis supplied). 362 Mass. at 444 (1972). Racial imbalance in Springfield, existing only on the elementary level, is susceptible of quick and effective reversal, and does not even begin to approach the type of complexity which we noted, with reference to the city of Boston, might justify short-term, partial solutions by a school committee. *School Comm. of Boston* v. *Board of Educ*. 363 Mass. at 131.[6]

3. Under G. L. c. 15, 1I, the board is required to render "technical and other assistance [to school committees] in the formulation and execution of plans to eliminate racial imbalance." The school committee contends that when the board conducted hearings on August 1, 1973, it had not yet provided this necessary assistance, and that therefore the hearings were premature. Both the hearing examiner and the board found that the board's obligation had been met, and we conclude that there is substantial evidence to support those findings.

---

[5] Thus the approach, argued for by the school committee, would make it "capable of repetition, yet evading [judicial] review." *Southern Pac. Terminal Co.* v. *Interstate Commerce Commn*. 219 U. S. 498, 515 (1911).

[6] What we have said here also disposes of the school committee's related argument that it was entitled to a finding of fact that its plan either would or would not substantially reduce racial imbalance.

The board made a conscientious and continuing effort to offer assistance to the school committee during the period between the issuance of the *Springfield I* decision and the hearing on August 1, 1973. The board itself met with the school committee three times, and their respective staffs met several times. There were numerous telephone and written communications. Much of these exchanges concerned the board's definition and interpretation of the crucial terms "neighborhood," "gerrymander," "safety," and "transportation" (concerning which we have said that precise definitions are not possible and that each situation, essentially, must be evaluated on its own facts and circumstances). See *Springfield I,* 362 Mass. at 440 (1972). At a public meeting between the board and the committee on March 29, 1973, the board made clear its views on Springfield's imbalance problems, and emphasized its willingness to provide continuing assistance to the committee. While other instances of affirmative board action could be readily detailed, we think it is unnecessary. If there has been demonstrated an unwillingness to grapple with the technical and legal problems of Springfield's situation, it has been on the part of the school committee, not the board.

The school committee offers an alternate argument in support of its position that the August 1 hearing was held prematurely. The public notice of the hearing specified that a hearing examiner had been appointed to evaluate "plans submitted to the Board by the Springfield School Committee and the staff of the Task Force on Racial Imbalance." The school committee contends that before hearings on a school committee plan can be held, the board must first evaluate the plan, and if it disapproves, offer its specific recommendations to the school committee as to how its plan can be made acceptable. There is little merit to this argument. In *School Comm. of Boston* v. *Board of Educ.* 364 Mass. at 202 (1973), we approved the procedure followed by the board in this instance. See *School Comm. of Boston* v. *Board of Educ.* 363 Mass. at 130 (1973). In that

case, the board conducted a hearing concerning school committee and Task Force plans, rejected the school committee plan and recommended the Task Force plan. The same procedure was followed here. In view of the delays experienced in bringing Springfield's elementary schools in racial balance, consolidated hearings of this nature are desirable and necessary.

4. In addition to its claim that the August 1, 1973, hearings were premature, the school committee argues that it never received sufficient notice of the hearings and that the issues to be discussed were not adequately defined. There is no merit to the school committee's contention.

The board informed the school committee that a hearing examiner had been appointed "for the purpose of conducting hearings on plans submitted to the Board by the Springfield School Committee and the staff of the Task Force on Racial Imbalance, which plans were or will be submitted pursuant to G. L. c. 71, § 37D. . . . No pleadings need now be filed. The Committee, if it wishes to submit an additional plan, the Task Force on Racial Imbalance, if it wishes to submit a proposed plan, . . . must submit such plan or plans to the Hearing Examiner at least five days prior to the hearing." Even if we assume a conceivable doubt about the facial effectiveness of the notice in informing the school committee about what was to be discussed the context in which the need for the hearings arose made crystal clear the nature and purpose of the hearings. The school committee was under an obligation to balance Springfield's elementary schools by September, 1973. It and its staff had met with the board and its staff on numerous occasions in an attempt to resolve the matter, and it had been informed by the board (and by the *Springfield I* decision) what the racial imbalance act required. It was also well aware of the existence and character of the Task Force plan. In short, it is disingenuous for the school committee to argue that it went into the August 1 hearings without a sufficient understanding of the issues that were going to be dealt with.

QIEC's Objections.

There remains for our consideration the contentions of QIEC. In the proceedings before the hearing examiner QIEC not only raised several objections to the Task Force plan but also submitted its own racial balance plan for the consideration of the hearing examiner.

In argument before this court, however, QIEC has limited its argument solely to questions concerning the constitutionality of the treatment of Puerto Rican students in Springfield, especially those attending schools in the proposed District VI of the Task Force plan. The factual background of these constitutional claims is as follows.

The population of District VI was described by the hearing examiner as approximately one-third white, one-third nonwhite, and one-third Puerto Rican. Several of the elementary schools in District VI have predominantly Puerto Rican student populations.[7] Puerto Ricans are not generally classified as "non-white" for purposes of the racial imbalance law.[8] Therefore none of the schools in District VI is currently racially imbalanced within the meaning of the statute. The Task Force plan therefore includes no provision for balancing the ethnic composition of the predominantly Puerto Rican schools.[9] The board had some doubts as to the propriety of this aspect of the plan, but felt it had no authority to reject on constitutional grounds a plan which complied with the requirements of the racial imbalance law. See *Springfield I,* 362 Mass. at

_____

[7] The schools which have student populations which are more than 50% "Spanish" are: Brightwood (61%), Carew Street (84.9%), Jefferson Avenue (63.4%) and School Street (57.6%). These data are from an exhibit, offered by QIEC, entitled, "Springfield School District — Racial Composition '72-'73."

[8] Classification under the racial imbalance law is based on a reasonable and practical interpretation in accordance with common speech, and may for practical purposes depend on appearances. See *School Comm. of New Bedford* v. *Commissioner of Educ.* 349 Mass. 410, 415-416 (1965); *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693, 697 (1967).

[9] A second reason given by the board for not dispersing the Puerto Ricans throughout the system was the convenience of conducting second language programs in only a few rather than many schools.

432 (1972). The board did order, in its "long-range" order, that the school committee study methods whereby the "minority isolation of District VI" could be ended.

QIEC's argument is twofold. First, because of the already existing predominance of Puerto Ricans in certain schools in the proposed District VI, QIEC contends that Springfield is at present maintaining an ethnically segregated school system in violation of the Fourteenth Amendment to the United States Constitution. Second, because the Task Force plan excludes District VI from the balancing scheme, implementation of that plan would itself be unconstitutional in that it would reinforce existing ethnic segregation of Puerto Rican students in the District VI schools. QIEC argues that the first constitutional problem can be remedied and the second problem can be avoided only if we construe the term "non-white" in the racial imbalance law to include Puerto Ricans, declare the Task Force plan to be in violation of the statute, and require the preparation of an amended plan which would provide for ethnic as well as racial balancing of Springfield's schools.

At the outset, we have serious doubts as to QIEC's standing to assert what it purports to be the interests of the Puerto Rican community of the proposed District VI. In order to maintain this suit on any ground QIEC must show either that it will itself be harmed by enforcement of the Task Force plan or that it represents a class of persons which will be so harmed. QIEC has shown neither. In its bill filed in the Superior Court, QIEC describes itself only as an "association of residents of Springfield who have and have had children attending Springfield Public Schools; and who allege that their children and other children are being deprived of the benefits of a racially and ethnically balanced and integrated Public School System."[10] Thus, there is no express allegation that any member of QIEC is also a member of the class of persons whose rights QIEC is asserting, namely, Puerto Rican school children who at-

---

[10] In its brief, QIEC adds only that it is a "multi-racial, bilingual group."

tend ethnically unbalanced schools in District VI. We have no way of knowing, therefore, whether there exists an "actual controversy" between QIEC and the board so as to permit declaratory relief pursuant to G. L. c. 231A, § 1, see *Hillman* v. *Second Bank-State St. Trust Co.* 338 Mass. 15 (1958), whether QIEC is a "person . . . aggrieved" by an agency decision so as to permit an appeal pursuant to G. L. c. 30A, § 14, see *Duato* v. *Commissioner of Pub. Welfare*, 359 Mass. 635, 637-638 (1971),[11] or whether we could, consonant with the requirements of due process, issue a decree declaring the rights of the class of Puerto Ricans in District VI in the absence of notice to members of the class, see *Eisen* v. *Carlisle & Jacquelin*, 391 F. 2d 555, 568 (2d Cir. 1968), citing *Mullane* v. *Central Hanover Bank & Trust Co.* 339 U. S. 306 (1950), and in the absence of a showing that the party before the court is fairly representative of the class members. See *Hansberry* v. *Lee*, 311 U. S. 32 (1940); *Dolgow* v. *Anderson*, 43 F. R. D. 472, 493-494 (E. D. N. Y. 1968). Compare *Potts* v. *Flax*, 313 F. 2d 284 (5th Cir. 1963).

Even if it were fully established that QIEC was a proper party to assert the constitutional claims of the Puerto Ricans of District VI, however, on the record before us we would reject those claims. As to QIEC's first argument, there is nothing in the record which would support the claim that the present ethnic composition of Springfield's public schools violates the constitutional rights of Puerto Ricans.[12] Although it is true that at least four Springfield

---

[11] Even if QIEC could show itself to be a person aggrieved by the board's decision to implement the Task Force plan, it nevertheless could not maintain an appeal under G. L. c. 30A, § 14, because that section permits appeals only from "adjudicatory proceedings[s]." The proceedings before the hearing examiner and the board did not involve the determination of the rights of "specifically named persons" and thus were not "adjudicatory" within the statutory definition. G. L. c. 30A, § 1 (1).

[12] We assume, without deciding, that Puerto Ricans, or "Spanish," may constitute an identifiable class for purposes of the Fourteenth Amendment. See *Keyes* v. *School Dist. No. 1, Denver, Colo.* 413 U. S. 189 (1973), in which the Supreme Court of the United States declared that "Hispano," a term comprising persons of Spanish, Mexican or Cuban heritage (at 195, n. 6), constituted a class cognizable under the Fourteenth Amendment. *Id.* at 197. See *Hernandez* v. *Texas*, 347 U. S. 475 (1954); *United States* v. *Texas Educ. Agency*, 467 F. 2d 848 (5th Cir. 1972). Compare *Tijerina* v. *Henry*, 48 F. R. D. 274 (D. N. M. 1969), app. dism. 398 U. S. 922 (1970).

schools currently have student populations which are predominantly "Spanish,"[13] there is no evidence which would indicate that that ethnic concentration has in any way resulted from actions by State or local school authorities which were or might have been motivated by an intent to segregate Puerto Rican students. Absent such a showing of intent to segregate there can be no finding of de jure segregation. *Keyes* v. *School Dist. No. 1, Denver, Colo.* 413 U. S. 189, 208 (1973). And it is clear that the Fourteenth Amendment proscribes only de jure segregation, that is, segregation which results from affirmative State action. See *Brown* v. *Board of Educ. of Topeka*, 347 U. S. 483 (1954); *Green* v. *County Sch. Bd. of New Kent County*, 391 U. S. 430 (1968); *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1 (1971); *Keyes* v. *School Dist. No. 1, Denver, Colo., supra.* To show that the present ethnic distribution of students in Springfield schools is constitutionally invalid, QIEC relies almost entirely on the statistics which show that several schools are predominantly Puerto Rican. This is certainly not enough. What is missing is any proof that school authorities have purposefully acted so as to create such ethnic concentration.[14] There is, therefore, no basis in the record for a finding that the concentration of Puerto Ricans in some Springfield schools constitutes de jure segregation in violation of the Fourteenth Amendment. See *School Comm. of Boston* v. *Board of Educ.* 363 Mass. 20, 23, n. 4 (1973).

QIEC's second argument is that, regardless of any failure to show State involvement in the present ethnic distribution of students in the Springfield schools, the implementation of the Task Force plan would itself constitute State action and, by failing to remedy the existing ethnic imbalance in certain schools, would violate the con-

---

[13] See fn. 7, *supra.*

[14] For discussions of the type of evidence which might be offered to prove segregative intent, see, e.g., *Keyes* v. *School Dist. No. 1, Denver, Colo., supra,* at 201-202, and *United States* v. *Texas Educ. Agency,* 467 F. 2d 848, 864-866 (5th Cir. 1972). See the *Keyes* case also for a discussion of the presumptions which arise and the shifting of the burden of proof which occurs once there has been a finding of de jure segregation as to one portion of a school district.

stitutional rights of the Puerto Ricans attending the pre-
dominantly Puerto Rican schools. There is no question that
implementation by the board and the committee of the
Task Force plan, or of any other pupil assignment plan, is
State action for purposes of the Fourteenth Amendment.
See *Keyes* v. *School Dist. No. 1, Denver, Colo., supra*, at
201-202; *Cisneros* v. *Corpus Christi Independent Sch. Dist.*
467 F. 2d 142, 147-148 (5th Cir. 1972) cert. den. 413 U. S. 920
(1973). However, as we noted in the preceding paragraph,
the element which is necessary to show a constitutional
violation and which is missing from this record is not State
action but rather segregative intent on the part of the
school authorities. *Keyes* v. *School Dist. No. 1, Denver,
Colo., supra*, at 208. We do not believe that any such
segregative intent can be attributed to the board in its
approval of and efforts to cause implementation of the Task
Force plan. In fact, the board's purpose is precisely the
opposite, i.e., the board is acting to eliminate segregation,
albeit only racial and not ethnic segregation.

In support of its argument, QIEC relies heavily on
*Cisneros* v. *Corpus Christi Independent Sch. Dist., supra*,
and *United States* v. *Texas Educ. Agency*, 467 F. 2d 848
(5th Cir. 1972), in both of which the court ordered affirma-
tive action to end segregation of Mexican-American school
children. The *Texas Educ. Agency* case is inapposite,
however, because the court made it clear that it was acting
to eliminate de jure segregation. 467 F. 2d at 864-867. In the
absence of evidence to the contrary, we must assume that
any segregation of Puerto Rican school children in
Springfield is de facto rather than de jure. The decision in
the *Cisneros* case, on the other hand, while apparently
more helpful to QIEC's argument, is based on a mis-
apprehension of the law. The court in that case purported
to "discard the anodyne dichotomy of classical de facto and
de jure segregation," 467 F. 2d at 148, and held that
segregated schools may be found to violate the Constitution
even in the absence of any showing of intent to segregate.
*Id.* at 148, 150. It is clear from the *Keyes* case, decided after
the *Cisneros* case, that the Supreme Court still adheres to

the de facto/de jure distinction, 413 U. S. at 200, and still holds that the distinguishing factor between the two types of segregation is "*purpose* or *intent* to segregate." *Id.* at 208 (emphasis in the original). The value for our purposes of the *Cisneros* decision is therefore somewhat doubtful.

As we noted in *Springfield I*, 362 Mass. at 428-429 (1972), the racial imbalance law goes further than the United States Constitution in that it requires affirmative racial balancing of schools while the Fourteenth Amendment requires only elimination of the vestiges of State-imposed segregation. Adoption of QIEC's argument would lead to the anomalous situation wherein the State is acting properly if it makes no effort to eliminate de facto segregation of any sort, but as soon as it moves affirmatively to eliminate de facto racial segregation it is guilty of unconstitutionally "imposing" ethnic segregation. In other words, QIEC would have us hold that the State's attempt, not constitutionally required, to remedy racial imbalance somehow converts existing ethnic imbalance into de jure ethnic segregation. Since in approving the Task Force plan the board's purpose is clearly to remedy existing racial imbalance, not to reinforce existing ethnic segregation, we do not believe that implementation of the Task Force plan would violate the constitutional rights of Puerto Ricans in District VI. There is no intent to segregate. *Keyes* v. *School Dist. No. 1, Denver, Colo., supra*, at 208. In fact, the board has demonstrated its intent to integrate the Puerto Ricans of District VI into the rest of the school system by including in its "long-range" order directions to study means for ending the minority isolation of District VI. In this context enforcement of the racial imbalance law by implementing the Task Force plan will not, in our opinion, violate the Fourteenth Amendment.

## CONCLUSION.

In conclusion, we have determined that both the school committee's and QIEC's objections to the proceedings

before the hearing examiner and to the substance of the board's order are without merit. The cases are to be remanded to the jurisdiction of the single justice of this court who shall require timely compliance with the board's order so as to ensure the implementation of the Task Force plan by September, 1974. Once before we set a deadline by which the board and school committee were to have acted to eliminate racial imbalance in Springfield's schools, *Springfield I*, 362 Mass. at 444, 446 (1972), but that date came and went with no results having been achieved. In order to ensure that a similar fate does not befall our new deadline, the single justice will retain continuing supervisory jurisdiction of this case. We repeat our admonishment, directed at different parties but in a similar context, that "the time for testing the meaning of the statute has long since passed and . . . the time for prompt action to implement it is at hand." *School Comm. of Boston* v. *Board of Educ.* 364 Mass. at 210.

These cases are remanded to the county court. In the suit by the school committee the single justice shall enter an interlocutory decree overruling the plaintiff's demurrer to the counterclaim, and a final decree dismissing the bill and, on the counterclaim, affirming the board's opinion and order and requiring timely compliance therewith. In the suit by QIEC, the single justice shall enter a final decree dismissing the bill. The single justice shall retain jurisdiction of the matter and shall issue whatever orders he deems necessary to ensure implementation of the Task Force plan by September, 1974.

*So ordered.*