BOARD OF EDUCATION *vs.* SCHOOL COMMITTEE
OF SPRINGFIELD.

Suffolk.    January 5, 1976. — April 5, 1976.

Present: HENNESSEY, C.J., REARDON, BRAUCHER, KAPLAN,
& WILKINS, JJ.

*Racial Imbalance Law.   School and School Committee.   Education.
Jurisdiction,* Review under racial imbalance law. *Administrative
Agency.*

The record in a civil action supported a finding by the State board of
education that it had met the obligation imposed by G. L. c. 15,
§ 1I, as amended by St. 1974, c. 636, § 1, of "providing technical

assistance" to a school committee in plans to reduce or eliminate racial imbalance in public schools. [46-48]

Where an opportunity was afforded for adequate development of and argument on the opposed positions of a school committee and the State board of education respecting implementation of a plan to reduce or eliminate racial imbalance in public schools before the board issued its order in August, 1975, any variance from literal compliance with G. L. c. 15, § 1I, as amended by St. 1974, c. 636, § 1, was without significance. [48-49]

There was no merit in a contention of a school committee that an order of the State board of education dealing with a long range plan to achieve racial balance in public schools exceeded the understood scope of the proceedings before the designated hearing officer. [49-50]

The alternative feature of an order of the State board of education that a school committee file an approved plan for a "magnet" program or for an assignment program as a means of attracting certain students to a new school did not involve the essential legality of the board's order. [50-51]

With respect to an existing, working, comprehensive plan for the school system of a city which needed modification to take into account a new elementary school completed in one of the six districts and in an area with an unanticipated concentration of Hispanic students in elementary schools in that district, the record in a civil action disclosed an adequate basis for an order by the State board of education that the new school should have a 4-6 grade structure for the 1975-1976 school year only, that commencing with the school year 1976-1977 the new school should have a 5-6 grade structure only, that the school committee should file with the board an approved plan for a "magnet" program to attract to the new school white non-Hispanic fifth and sixth grade students from any part of the city or file an approved plan which would assign students from other areas to the new school in such a manner that the resulting racial and ethnic composition there would reduce its minority percentages to an acceptable level, and that the school committee should file approved plans for the location of a new school facility in the neighborhood. [51-59]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on August 20, 1975.

The case was reserved and reported by *Kaplan, J.*

*L. Scott Harshbarger,* Assistant Attorney General (*Daniel P. Jaffe,* Special Assistant Attorney General, with him) for the Board of Education.

*Richard T. Egan,* Acting Associate City Solicitor (*Leonard A. Shatz* with him) for the School Committee of Springfield.

*Gerald R. Hegarty* (*William F. Malloy & Robert D. Fleischner* with him) for Autumn Bruce & others.

KAPLAN, J.   In the present case the court holds that an order of the Board of Education of the Commonwealth (State Board) affecting the Springfield "Six District Plan" finds adequate support in the record and is to be enforced.

1. *The Reservation and Report.*   On August 20, 1975, the State Board commenced this proceeding in the county court against the School Committee of the City of Springfield (School Committee) to secure enforcement of an order of the State Board dated August 18, 1975, dealing with the opening of the Brightwood Community School,[1] and to that extent calling for modification of the Six District Plan for the Springfield elementary school system. In substance, this was a petition to modify the decree on rescript of this court in *School Comm. of Springfield* v. *Board of Educ.*, 365 Mass. 215 (1974) (*Springfield II*), which approved the Six District Plan and ordered it to be put into effect, a decree as to which this court has retained a continuing jurisdiction.

On motion of the State Board, an interlocutory order was issued by a single justice of this court on August 29, 1975, requiring the School Committee to comply in certain respects with the State Board's order of August 18, 1975 (the details will be mentioned below). In due course the defendant School Committee filed an answer to the petition and a counterclaim praying (among other things) that the August 18, 1975, order be declared invalid and unenforceable.[2] The State Board replied to the counterclaim. Interveners Autumn Bruce and others, who may be referred to as the "Quality Integrated Education Committee" (QIEC), responded to the petition by joining in its prayers and also replied to the counterclaim.

The School Committee moved for judgment on the pleadings and the State Board moved to strike the School

---

[1] It appears that after commencement of the proceeding the school was designated "New North Community School."

[2] The counterclaim sought various declarations, which need not be enumerated, and appointment of a master to conduct proceedings with regard principally to constitutional questions. See n.29 below.

Committee's counterclaim. On the hearing of these motions by a single justice, it appeared that a record could be agreed upon by the parties which would present the merits for decision. Accordingly, the procedural motions were abandoned, a record was thus prepared, and by agreement the single justice reserved and reported the case, without decision, to the full court, with the understanding that "[t]he case may be viewed as if, on the whole record, cross-motions had been made for summary judgment."

2. *Statement of the Case.* The history of the attempts to bring the Springfield schools into "racial balance" can be read in our opinions in *Springfield I, II,* and *III (School Comm. of Springfield* v. *Board of Educ.,* 362 Mass. 417 [1972]; *School Comm. of Springfield* v. *Board of Educ.,* 365 Mass. 215 [1974]; *School Comm. of Springfield* v. *Board of Educ.,* 366 Mass. 315 [1974], cert. denied, 421 U.S. 947 [1975]). It will suffice here to say that some nine years after the enactment of the racial imbalance law (G. L. c. 15, §§ 1I-1K; c. 71, §§ 37C, 37D; see St. 1965, c. 641, St. 1969, c. 643, St. 1971, c. 958), this court in *Springfield II* upheld, against attack by the School Committee, the order of the State Board dated October 12, 1973 (and further order of February 11, 1974), embodying the Six District Plan, a short-term plan for achieving racial balance, to become effective with the opening of classes in September, 1974. In essence, the plan as approved fashioned six elementary districts out of the existing thirty-six, with the five then imbalanced schools being severally assigned to five of the new districts. Some busing of students was involved, to a maximum of 4.5 to 5 miles. Grade structures of K 1-4, and K 5-6, were introduced, which permit most students to attend neighborhood schools (as under the thirty-six district situation) during some part of their elementary school training. Final decree after rescript was entered on May 15, 1974, requiring the School Committee "to make timely compliance with [the State Board's order] and the schedule for implementation of the ... plan."

While the School Committee was carrying out that schedule, St. 1974, c. 636, became effective on July 26,

1974. This revised the racial imbalance law materially, so that, had the new statute applied, it would not have authorized the State Board to require certain of the measures incorporated in the Six District Plan. The School Committee promptly went before the single justice to seek vacation of the decree of May 15, 1974. On reservation and report to the full court, the court in *Springfield III* unanimously denied the application and reaffirmed its decree. According to four members of the court, on the assumption that the new statute was intended to operate retrospectively on the plan approved in the court's decree, it was unconstitutional. The other three Justices, concurring in the result, found that the new statute did not express an intention thus to operate retrospectively; for reasons of equity they would not apply its policy to defeat the decree.[3] Following this decision, the elementary schools in Springfield opened in September, 1974, racially balanced.

When the State Board entered its order of October 12, 1973, regarding the short-term plan, it also, on the same day, entered a complementary order requiring the School Committee to prepare a "long-range" plan to be submitted to the State Board by October 15, 1974. This plan was to "include provisions for construction and other methods to be used to achieve racial balance." The School Committee was ordered, further, to "undertake a study as to methods of integrating those students located in District VI of the short-term plan in order to end the minority isolation of District VI found to exist by the Hearing Examiner in the short-term plan. The recommendations that result from this study should be consonant with the Bilingual Education Law, G. L. c. 71A, § 5 and with the Racial Imbalance Law. The School Committee shall undertake this study with assistance from the State Department of Education." (From this long-range order of October 12, 1973, the School Committee did not attempt an appeal.)

The "minority isolation" in District VI just mentioned had been the subject of special consideration in the State

---

[3] The principle of equity involved is mentioned at n.28 below.

Board's opinion accompanying its order of October 12, 1973, on the Six District Plan. District VI, in the northwesterly part of Springfield, contained a large segment of the Spanish surnamed or Spanish speaking population of the city. Though public schools in District VI could be considered racially balanced (if Hispanic students were not counted as nonwhite for the purpose of "balance"),[4] there was "minority isolation" in the sense that the schools comprised a percentage of Hispanic students well in excess of that for the whole school population of the city; this, said the State Board, might be in violation of the Fourteenth Amendment, and there was a "continuing obligation to remedy that situation." Hence the reference to District VI in the order for the long-range plan. The same problem of the Hispanic students and its possible constitutional implications was also adverted to in *Springfield II*, 365 Mass. at 228-233.

The School Committee did not submit a long-range plan by October 15, 1974. The deadline was extended to December 2, 1974. On February 25, 1975, the State Board requested a submission prior to March 25, 1975, and on April 22, 1975, the State Board voted to require it by April 30, 1975. On May 8, 1975, the School Committee passed a resolution to file with the State authorities a document entitled "Long Range Recommendations for Springfield Public Schools Revised" (April, 1975) consisting of thirteen recommendations. The School Committee, however, did not indicate that it approved these recommendations. Accordingly, the Attorney General, at the instance of the State authorities, wrote to the School Committee that the passage of the resolution did not constitute compliance with the law or the State Board's order of October 12, 1973; referring to *Springfield II* (365 Mass. at 224-225), he said that the filing requirement of the racial imbalance law could be met only by the filing of a "plan" "approved" by the School Committee. The Attorney General wrote, further, that unless "clear and unequivocal

---

[4] See *Springfield II*, 365 Mass. at 228 n.8.

evidence" — to be offered by the Committee itself and not by the superintendent of schools or any other designee — was provided forthwith to the State Board that the School Committee had by a vote approved a long-range plan, he would take such legal action as might be necessary to ensure that the School Committee complied with the law.

The Springfield superintendent of schools informed the State authorities by letter of June 2, 1975, that the School Committee had passed a resolution on May 29, 1975, "to submit to the [State Board] the recommendation of the School Committee that ... [the terms of Recommendation No. 3] as they appear on the Long-Range Recommendations for Springfield Public Schools ... be implemented with the opening of school in September, 1975." Recommendation No. 3, as will be seen, centered on the opening of the Brightwood Community School in District VI.

On June 13, 1975, the Commissioner of Education wrote to the chairman of the School Committee that the State Board had concluded that the School Committee's actions of May 8 and May 29, 1975, did not result in the filing of an approved plan complying with the order of October 12, 1973. He said the State Board would take action in the next several months to ensure the development of a long-range plan. However, "[t]he most immediate and pressing issue before the Board [was] the scheduled opening of the new Brightwood Elementary School in September, 1975," and the State Board along with the School Committee felt that that issue must be faced expeditiously. The May 29, 1975, proposal regarding the Brightwood School was one to modify the Six District Plan which continued in effect in Springfield under orders of the court and could not be modified without the consent of the State Board and the court. The State Board must scrutinize any such proposed modification carefully. Therefore the State Board desired to proceed with administrative hearings.

On June 13, 1975, upon due notice, the State Board issued an order for hearings to commence before a designated hearing officer on June 30, 1975. "The purpose of the hearings shall be to develop recommendations to the Board

for modification of the Six District Plan to provide for the opening of the new Brightwood School in September, 1975, consistently with all requirements of law. The hearings shall also concern development of proposals to reduce the minority isolation in District VI as such proposals are related to the opening of the new Brightwood School.

"To this end the Hearings Officer may consider the May 29, 1975 proposal of the Springfield School Committee to the Board and may reserve the question of whether said proposal has been properly submitted to the Board. . . ."

Public hearings were held on eleven days commencing June 30 and ending July 17, 1975. They were conducted in English with Spanish translation. Press and other reporting was extensive. Besides the School Committee and the State Department of Education, participants included the intervener QIEC (an association of minority and non-minority residents in all six districts), the intervener Sixth District Committee for Quality Education (Sixth District Committee) (an association of minority and nonminority residents of District VI), and six individuals who accepted an invitation of the hearing officer to interested persons to appear. Two written statements were received in response to a similar general invitation. The transcript of testimony and argument before the hearing officer ran to 1,600 pages with many exhibits.

The hearing officer delivered his report, with his recommendations, on August 4, 1975. Seven days were allowed by the State Board for written objections and commentary which were considered in open session on August 12. The opinion and order of the State Board, in substance approving the recommendations of the hearing officer and ordering them into effect, were issued on August 18, 1975.

It will be convenient to describe in synopsis the School Committee's Recommendation No. 3, reserving the question whether it was a "plan" or intended by the School Committee to extend beyond 1975-1976.[5] We shall then put it by the side of the plan embodied in the order of

---

[5] On this question, see n.26 below.

August 18, 1975, the substance of which is quoted in the margin.[6] (The evolution of this order will be dealt with at point 4 below.)

Brightwood Community School is a new facility, constructed at large expense, located in District VI, with places for about 1,100 students. The School Committee's Recommendation No. 3 proposed that it have a 4-6 grade structure, with the students for the three grades drawn from the Carew, old Brightwood, and Lincoln Schools in District VI (all then K-6 schools with heavy Hispanic elements), and additional students for grades 5-6 drawn from those attending or to attend Tapley School in District V (then an integrated upper elementary school).

The State Board's order adopts the arrangement proposed by the School Committee for the year 1975-1976.

---

[6] "Specifically the Board issues the following orders to the Springfield School Committee and Superintendent:

"1) The new Brightwood school shall have a 4-6 grade structure for the 1975-76 school year only. The fourth graders shall be drawn entirely from the Carew, [old] Brightwood, and Lincoln Schools in District VI. The fifth and sixth graders shall be drawn entirely from the same schools and from the Tapley School in District V. The Tapley School shall be used for kindergarten purposes.

"2) Commencing with the school year 1976-77, the new Brightwood shall have a 5-6 grade structure and shall not have a fourth grade. The fifth and sixth grade students shall be drawn from the Tapley School in District V and from the Carew, [old] Brightwood, and Lincoln Schools in District VI. The remaining seats for the fifth and sixth grade students at the new Brightwood School shall be filled in accordance with orders of the Board to be issued at a future date.

"3) On or before October 15, 1975 the Committee shall file with the Board a plan approved for implementation of a magnet program to be in place at the new Brightwood School in September 1976 to attract white non-Hispanic fifth and sixth grade students. In the alternative, the Committee may file with the Board on or before October 15, 1975 an approved plan for implementation in September 1976 that assigns fifth and sixth grade students from other areas to the new Brightwood in such a manner that the resulting racial and ethnic composition of the new Brightwood would reduce the minority percentages at that school from the 1974-76 level to an acceptable level. Such plans (magnet and assignment) shall utilize the new census data from the October 1, 1975 school census.

"4) On or before October 15, 1975, the Committee shall file with the Board approved plans for the location of a new school facility in the Model Cities neighborhood.

"So ordered."

But beginning in September, 1976, the school is to have only grades 5-6, the students to be drawn from the three named schools in District VI and from those otherwise destined for Tapley School. Remaining places will be filled under orders to be issued by the State Board which will be responsive to the following: by October 15, 1975, the School Committee shall file an approved plan for a "magnet" program[7] starting in September, 1976, to attract non-Hispanic white fifth and sixth grade students from any part of the city; alternatively, the School Committee may file a plan that will assign students from other areas to Brightwood Community School so as to reduce minority percentages to an acceptable level. The Tapley School will be abandoned except for kindergarten. The School Committee is required to file approved plans for a new school facility in this "Model Cities" neighborhood.

When the August 18, 1975, order was issued, time was of course running very short for the opening of the Brightwood Community School. The State Board applied promptly to the single justice for an interlocutory order covering the State Board's order of August 18, 1975, except for the grade and some related arrangements for the year 1976-1977 (see pars. 1, 3, and 4 of the order set out in n. 6). The interlocutory order issued on August 29, 1975. Then followed the present petition by the State Board to enforce its order of August 18, 1975, looking chiefly to the period commencing with the opening of school in September, 1976.

We proceed to the issues, procedural and substantive, referring to the additional facts relevant to each. We conclude that each of the objections taken to the State Board's order fails, and that the order is valid.

3. *Procedural Objections.* The School Committee presses initially a number of objections that are distinctively procedural. The standards of procedural regularity to which the School Committee, the State Board, and others refer are typically (although not exclusively) those expressed in or derivable from the racial imbalance law. We note that

[7] See G. L. c. 71, § 37I.

it is not always possible to apply the procedural provisions of that law (either as originally enacted or as amended) word for word to the present situation. The statute is basically addressed to the formulation and approval of plans to correct conditions of racial imbalance. It does not speak so clearly to the case where a city wide plan, which has gone through the administrative stage and been approved and embodied in a court decree, is sought to be revised to admit a new school which as yet has no student population, "balanced" or "imbalanced" (such revision being preliminary to a possible long-range overhaul of various features of the approved plan). However, the parties are right to look to the statutory procedures as providing the essential pattern to be followed, if not altogether literally, then as a cogent analogy. Thus the School Committee was entitled to technical assistance from the State Board; in the administrative process the School Committee was required to furnish a definite plan or plans to the State Board which the State Board was to scrutinize and approve, reject, or modify; and the plan after emerging from the administrative phase could be reviewed by the court with that deference to the final administrative decision which has previously been described in the Springfield litigation (see *Springfield II,* 365 Mass. at 221; see also *School Comm. of Boston* v. *Board of Educ.,* 364 Mass. 199, 205 [1973]).

(a) The School Committee objects that it did not receive adequate "technical and other assistance" from the State Board (see G. L. c. 15, § 1I, as amended by St. 1974, c. 636, § 1), whence it is apparently supposed to follow that the State Board's order fails and may not be enforced. The State Board examined the objection and found, in its opinion accompanying its order of August 18, 1975, that "the [State] Bureau of Equal Educational Opportunity met its obligation of providing technical assistance to the Committee." (Indeed, the State Board on its side "notes the difficulty its staff encountered in assisting the School Department because of Springfield's failure to provide them with data on projected racial compositions.") We perceive no basis for disagreeing with the State Board's finding.

The record refers to meetings and correspondence between city and State representatives with exchange of information and ideas. The exchange continued after May 8, 1975. The School Committee does not indicate concretely what kind of technical assistance was withheld that might have been significant. There is complaint by the School Committee that one or more State representatives, in giving assistance, disclaimed authority to speak for the State Board, but such a disclaimer should be understood as a cautious and correct reminder that the State Board was not precluded from disagreeing with a plan presented by the School Committee even if that was based, as the School Committee might think, on the technical advice proffered to it. A like response applies to the School Committee's further complaint that the advice it received did not serve to inform it that its proposed grade structure for the Brightwood Community School would prove unacceptable to the State Board except as a temporary measure. Argument for the School Committee almost reaches the point of contending that the technical assistance provided must necessarily have been inadequate because its proposal was rejected in part.

(b) General Laws c. 15, § 1I, as amended, states the following in substance. If a school committee has failed to file with the State Board a plan for racial balance within the time limit established by regulation of the State Board under G. L. c. 71, § 37D, or has filed a plan which does not meet the requirements of § 37D, then the State Board shall consult with the school committee and, after a public hearing, make specific recommendations for a plan conforming to § 37D (and add an explanation of how the recommendations comport with § 37D). The school committee may then file a revised plan in response to the recommendations. But if the State Board has not approved such a plan or its revision within four months after the time limit established for its filing by the regulation, the State Board may order that its recommendations shall be the mandatory plan to be implemented by the school committee.

In the present case the School Committee seems to suggest that § 1I ensured it a period of time for submitting a revised plan; and (without pointing specifically to a "regulation") it counts four months from April 30, 1975, the last date fixed by the State Board for filing a long-range plan (a date which the School Committee did not meet), as the minimum period for the State Board's issuing a plan with mandatory effect. But, says the School Committee, an interlocutory order of court enforcing a part of the plan had already been entered before the expiration of the four-month period. We are unaware that the School Committee insisted on its supposed right to file a revised plan before the time (according to its own calculation) had run; in fact it did not file a revised plan following the State Board's order of August 18, 1975. But the matter need not be analyzed in detail because it seems that § 1I is directed to a fresh racial imbalance plan and is not to be applied literally to the Springfield situation as it stood in the summer of 1975. From the procedural point of view, what was essential was that there should be opportunity for adequate development of an argument on the opposed positions of the School Committee and the State Board before the State Board issued its order.

(c) The School Committee contends that the order of the State Board of August 18, 1975, under review here, exceeded the understood scope of the proceedings before the hearing officer, and to that extent should be struck and disregarded. More particularly, the School Committee would strike pars. 2, 3, 4 of the order — those dealing with 1976-1977 — and leave only par. 1, the disposition made for 1975-1976. (See n.6.) That would render the present action entirely ineffectual.

It is evidently not claimed that the notice of hearing of June 13, 1975, should be read as so limited. Rather the claim is based on a colloquy between counsel and the hearing officer on the third day of the hearings. But the upshot of that conversation and others was that the subject of the hearings would be the opening of the Brightwood Com-

munity School and the reduction of minority isolation in
District VI as related to that opening, including considera-
tion of the Tapley School. We find it hard to distinguish
this subject matter from that described in the June 13
notice. The breadth of the actual discussion and analysis
at the hearings strengthens the impression that the partic-
ipants did not understand they were confined strictly to
1975-1976 and by the same token it cannot be fairly sug-
gested that the order went into territory not covered in the
hearings. Nor does it appear that any party was misled into
truncating its presentation because it thought anything
beyond 1975-1976 was irrelevant. On the matter of prepara-
tion for the hearings, we should recall that an order calling
for a long-range plan had been outstanding since October
12, 1973, and a set of long-range recommendations had
been prepared (though not "approved") by the School
Committee prior to the hearings.[8] The hearings in effect
focused on the Brightwood opening as a phase of long-
range planning. Indeed, when the hearing officer in his re-
marks toward the close of the hearings foreshadowed the
recommendations he finally made, counsel for the School
Committee did not contend that recommendations for
1976-1977 would exceed the permitted range of the hear-
ings. On the contrary, counsel appears to have affirmed
the power of the hearing officer to bring in such recommen-
dations.

(d) In *Springfield I,* 362 Mass. at 435, we held under
G. L. c. 15, § 1I (cf. § 1J, first par.), that where the School
Committee had failed to come forward with an acceptable
plan to achieve racial balance, and the State Board was
obliged after consultation with the School Committee to

---

[8] The State Board observed in its opinion of August 18, 1975: "The
Committee has had more than ample opportunity to file with the
Board a long-range racial balance plan. The Committee also had ample
opportunity in the hearings before the Hearing Officer to modify its
proposal as to the opening of the new Brightwood in such a way as to
propose a student body for that school that was not racially identifiable.
The Committee has deliberately chosen not to take either course. Ac-
cordingly, it will not now be heard to argue that the Board should delay
decision because of the Committee's failures to act."

"make specific recommendations for a plan," it was not enough for the State Board to indicate that any one of the three proposals that had been worked out previously would be satisfactory and that the School Committee could choose among them. We said the State Board must put a single proposition to the School Committee, at least if it intended to make subsequent failure of the School Committee to take decisive action a basis for withholding State aid from the city. By analogy to this aspect of the *Springfield I* decision, the School Committee suggests here that it may have been improper for the State Board by its order of August 18, 1975, to present the School Committee with the alternatives for 1976-1977 of adopting a magnet program or an assignment program as a means of attracting nonHispanic white students to the fifth and sixth grades at Brightwood Community School.[9] Influential in *Springfield I* was the fact that the choice related to the basic arrangement for the entire system of elementary schools in Springfield, and the further fact that the State Board was applying a very severe sanction. The choice presented in the present case, although it relates to more than a detail, is less vital for the system than that in *Springfield I*; and there is no question of a retributive starvation of funds. In all events we gather from the School Committee's argument that there is a definite preference for the magnet program and no disposition to press the point unless, perhaps, the court is of the view that it involves the essential legality of the State Board's order. We do not think it does.

4. *Evolution of the State Board's order of August 18, 1975.* The idea for a new Brightwood school originated in the early 1960's. Brightwood was to be a fully modern, upper elementary school, probably comprising grades 4 to 6, so located as to serve the North End-Brightwood area (later falling to District VI). There was some expectation that all students in that area reaching the upper grades

---

[9] Actually, the order is phrased to command — "shall" — preparation of a magnet program but to allow — "may" — an assignment program as an alternative.

would have a chance to go to this new school and, further, that the school would have strong local ties because it would accommodate community services and activities on the school premises. The racial or ethnic mixture in the neighborhood at the time did not present any issues of "imbalance" or "segregation" in existing schools nor was there apprehension that such questions would arise as to the proposed new school.[10]

When the Brightwood Community School was completed — apparently fulfilling its promise on the physical side — the city and State authorities faced acute unanticipated problems. The concentration of Hispanic students in elementary schools in District VI was very considerable,[11] with a prospect of yearly increases of not less than two per cent in the Hispanic population city wide and a larger increase in District VI. The population shift was symptomatic of other changes, not only demographic but social and economic, that had occurred and were continuing in various parts of the city. The Six District Plan effective in September, 1974, was itself a highly important, complicating factor. It not only altered attendance patterns at the schools, but affected materially the grade structures and educational programs. City and State authorities were on notice, particularly with respect to District VI, that beyond the problem of "balance" was that of racial or ethnic isolation.

The present case deals with the relative responses of the School Committee and the State Board to the question how the Brightwood Community School should be fitted into the web of the Six District Plan; for it must be under-

[10] Hispanic student enrollment figures as 1.91% of the total for the city in 1965; by 1974 it was 11.36%. (The corresponding percentages for nonHispanic white and black were: 1965 — 80.71%, 17.38%; 1974 — 62.38%, 26.26%.)

The Hispanic population of Springfield about the time of the hearings was estimated at fourteen per cent of the total.

[11] In the five K-6 elementary schools of District VI in 1974, the Hispanic student element was 69.4%, nonHispanic white, 21.3%, black 9.3%.

stood that the inauguration of such a school impinges on the rest of the system. As the State Board observed, the School Committee's proposal would "[affect] district lines, grade structures, transportation patterns, and the status of other schools under the Six District Plan." This was also true of the plan finally approved by the State Board, although the impact differed.

As noted above, the School Committee's Recommendation No. 3 hewed to a 4-6 grade structure for the new school, with Carew, old Brightwood, and Lincoln Schools in District VI each acting as a "feeder" for all three grades. These feeders were K-6 schools but would henceforth become K-3. Their Hispanic component, as already suggested, was very high, and their contribution (so to speak) to the new school would be of similar content.[12] A certain amount of "thinning" of the mix was to be provided by using the Tapley School in District V as a feeder for grades 5-6 of the new school. Tapley was a standard upper elementary school, K 5-6, which had been integrated; its contribution would be low in Hispanic students.[13] A considerable number of the students from the Tapley source would cross the existing District V-VI line by bus to attend the new school; many would anyway have been bused to Tapley.[14] Tapley would close except for kindergarten and perhaps some special uses. Summing up, under Recommendation No. 3 the racial composition of Brightwood Community School could be characterized by the figures: Hispanic, 550 students, 56.12% of the total enrollment of

---

[12] The Carew, old Brightwood, and Lincoln Schools' contribution to the new school would be about 519 Hispanic students, 84 nonHispanic white, and 55 black.

[13] The Tapley input to the new school would be approximately 31 Hispanic students, 193 nonHispanic white, 98 black.

[14] The fact that, technically, a new attendance district would be created did not itself arouse much contention at the hearings.

It was expected that part of the faculty of Tapley, including the principal, would be assigned to Brightwood Community School.

980; nonHispanic white, 277, 28.27%; black, 153, 15.61%. Some room would be left for special students.[15]

In the course of the hearings, the facts and arguments for and against the School Committee's scheme were developed at length, and possible alternative approaches were put forward and examined in detail.[16] The hearing officer's recommendations evolved quite naturally from the entire proof and discussion.

Under the School Committee's proposal the new school would open with a large number of students from the North End-Brightwood area in grades 4-6 and that would tend to conform to the presumed early expectation. There were, however, serious disadvantages emerging from the testimony that were set forth in the hearing officer's report and the State Board's opinion. The Hispanic element would be quite heavy (and the entire minority element, Hispanic and black, heavier still). The capacity of the new school would be virtually filled from the outset.[17] As the Hispanic population in District VI increased, a situation could be expected to arise shortly in which the new school, if it remained on a 4-6 basis, would have to refuse Hispanic students from the North End-Brightwood area and some would lose all opportunity to attend the school, thus in fact defeating the original expectation.[18]

Brightwood Community School as an upper elementary school had to be seen in relation to the other upper schools.

[15] When Brightwood Community School opened in 1975 on a 4-6 grade basis, the ·actual enrollment was: Hispanic 580 (55.82%), non-Hispanic white 270 (25.99%), black 189 (18.19%), total 1,039.

[16] Thus the Sixth District Committee proposed combining Districts V and VI into one district with three upper elementary schools, grades 4-6, serving as "anchors"; students in the neighborhood of each school would have priority of enrollment; the rest of the places would be filled by open enrollment from the combined district or by "magnet" from the entire city. The hearing officer analyzed this plan in his report and rejected it for the reason, among others, that it involved a 4-6 grade structure.

[17] See n.15 above.

[18] Changes in the composition of the student bodies of Carew, old Brightwood, and Lincoln as feeder schools might affect the result, but such changes were speculative.

It would stand apart from, and in contrast to, the eight upper elementary schools as they functioned after the Six District Plan. All were organized on a 5-6 grade basis. The Hispanic components in those schools in grades 5-6 ran from 1.2% to 9.6% (and the black from 24.4% to 31.5%). The new school would have a far greater Hispanic element. While it was unrealistic to expect the new school to start at or near the Hispanic level of the others, the combination in the new school of a relatively high Hispanic population with an exceptional 4-6 structure would render the place racially or ethnically identifiable. A dual grade structure incident to the racial or ethnic composition of the student bodies would be vulnerable to the charge of unequal educational opportunity and experience. Having fourth graders from the District VI sources enter the school simultaneously with fifth graders from the Tapley source was considered educationally undesirable for further, independent reasons.[19] If Brightwood Community School as an upper elementary school was permitted to deviate from the Six District model in order to serve the particular neighborhood's historical expectation, this could lead quickly to the breakdown of the Plan, for other neighborhoods could readily make similar claims.

As yet another objection to the School Committee's scheme, the view was expressed both by the hearing officer and the State Board that the launching, in modification of the Six District Plan, of a public school having the characteristics of minority isolation and racial identifiability as just described, would encompass a constitutional violation.[20] As stated in *Springfield III,* 366 Mass. at 334, the

---

[19] One of the reasons was summarized by the hearing officer as follows: "Since the fourth grade coming from District VI would be predominantly Hispanic, there could be problems with the relationships between the fourth graders and the fifth and sixth graders who would be not only ethnically different but also older, more mature, stronger, and academically advanced."

[20] Cited by the hearing officer were *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U.S. 189 (1973); *Morgan* v. *Kerrigan,* 509 F.2d 580 (1st Cir. 1974); *Spangler* v. *Pasadena City Bd. of Educ.,* 311 F. Supp. 501 (C.D. Cal. 1970).

Six District Plan brought about a "new status quo" by State action approved by judicial decree. Interposing the Brightwood Community School would also be State action. On the one hand, this directly affected Hispanic students, a group assumed (although not decided) in *Springfield II* to be cognizable for purposes of equal protection. 365 Mass. at 230 n.12.[21] On the other hand, it must alter the Plan itself in the several respects already mentioned. The School Committee's proposal, so the argument went, by yielding to supposed neighborhood claims, would produce discriminatory results as to the ethnic class; it also would create a disuniformity constituting a recession from the Six District Plan and threatening to weaken or destroy it. Thus, the argument continued, the situation would approach the one encountered in *Springfield III* where the State had attempted by means of St. 1974, c. 636, to retreat from the "new status quo."[22] If "intent" had to be established, then, according to the argument, it could be found in the conscious selection of that alternative which produced the greater concentration of the Hispanic minority students and the larger divergence in their treatment from that accorded others under the Six District Plan. (But cf. *Springfield III*, 366 Mass. at 329 n.21 — knowledge of likely result might be the equivalent of intent for the constitutional purpose.)[23]

---

[21] Among the cases cited were *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U.S. 189, 195 n.6 (1973); *Hernandez* v. *Texas,* 347 U.S. 475 (1954).

[22] This refers more particularly to the position of the four Justices as developed in the opinion of Chief Justice Tauro in *Springfield III,* 366 Mass. at 327-334. Cf. n.28 below.

[23] In *Springfield II,* 365 Mass. at 228-233, the court declined to act on certain constitutional objections urged by QIEC with respect to Hispanic students. The court doubted QIEC's "standing" and also thought there was no showing of "intent" to discriminate. No problem of standing was raised in the present case and it was argued that "intent" could be shown (if required). With respect to *Springfield II,* it is perhaps fair to add that as all problems could not be solved at once, it was not merely convenient but right to defer Hispanic issues until the

Consideration of the difficulties with the School Committee's submission led to the plan which was finally advocated by the State Department of Education at the hearings. This was to open Brightwood Community School as an upper elementary school with the standard 5-6 grade structure, using Carew, old Brightwood, and Lincoln Schools in District VI,[24] and Tapley School in District V, all as feeders for those two grades. This would yield a total of 732 students of whom 377 (51.50%) would be Hispanic, 229 nonHispanic white (31.15%), and 126 (17.21%) black. The sizable number of remaining places would be so filled as to relieve the still heavy Hispanic component — either by a "magnet" program which would draw white students from the city as a whole, or by selective transfers of groups of white students. If neither of the latter means could be availed of in the short time before the school opened, the State Department of Education thought it should be "underutilized" but with the 5-6 grade structure.

Thus the school would start with a better adjusted racial or ethnic mixture than under the School Committee's scheme, and would likely continue so. Further, limitation of the school to grades 5-6 would overcome, or at any rate long postpone, the problem of inability to receive some area students at any time. The new school would fall measurably in line with other upper elementary schools, and problems stemming from isolation and identifiability would be eased. There would be less affront or threat to the basic Six District Plan. The constitutional picture would be improved.

The hearing officer — who had been active in putting probing questions and suggestions to witnesses and counsel throughout the hearings — came around to the position taken by the State Department of Education, but with a variation. Believing that it was too late to introduce a

Six District Plan was made practically effective. The State Board's long-range order of October 12, 1973, looked to that sequence.

[24] A change in those schools from K-6 to K-4 would not be discordant with the rest of the system, as their K-3 structure would be under the School Committee's proposal.

magnet program at the new school for 1975-1976 (and evidently resistant also to ad hoc transfer of white students), the hearing officer was unwilling to leave the school "underutilized" for that year. Accordingly, he recommended that there be a third grade in 1975-1976 drawn from the Carew, old Brightwood, and Lincoln Schools. This was to be on the clear understanding that the school would move to a 5-6 grade structure commencing in 1976-1977. When the hearing officer hinted at this solution, the School Committee urged that the question of the shape of the school in 1976-1977 be left to a long-range plan concerning which the State Board was now contemplating hearings in October, 1975. The hearing officer did not follow this suggestion; besides being persuaded as to the merits of the 5-6 grade structure, he might well have thought, first, that it would be unwise, by postponing decision, to arouse expectations that the 4-6 structure would continue, and, second, that the past performance of the School Committee created more than a doubt that it would cooperate in the timely development of a long-range plan.

The hearing officer made a final recommendation with respect to the Tapley School which was a principal concern of QIEC. It seemed agreed on all hands that this school, built in 1887, was conspicuously unsuited for grades 5-6. Henceforth it would be used for kindergarten and perhaps some special purposes. It appeared that the relevant area, which had a large black population, had been subjected to more than its equitable share of busing. Currently many students attended out-of-neighborhood schools during their whole elementary experience. Forecasts of large increases of population in that part of the city (encouraged by new building) contrasted with an exceptional dearth of available elementary school seats there. These considerations, among others, were back of the hearing officer's recommendation that the School Committee proceed with plans for a new school facility in the Tapley School area. It may be noted that an unsubmitted Recommendation No. 8 of the School Committee's long-range

recommendations called for a new K-4 school in this "Model Cities" neighborhood.[25]

The State Board's order of August 18, 1975, supported by its opinion of the same date, adopted in effect the recommendations of the hearing officer.

5. *Objections to the plan adopted by the State Board.* (a) The School Committee argues that the State Board was not empowered to go the length of its order of August 18, 1975: it says, first, there was properly before the State Board only a problem of "balance" under the racial imbalance law, and, as Recommendation No. 3 would have achieved balance under that law, there was no basis for rejecting part of that recommendation and approving a variant; second, it was not open to the State Board to take any account of possible constitutional difficulties with Recommendation No. 3, any such question being for decision by the court alone in distinct proceedings.

We express serious doubt whether the School Committee is in a position to call on the State Board to justify its departure from Recommendation No. 3, for the School Committee never presented a "plan" that it "approved."[26]

---

[25] QIEC, in addition to stressing its claim that unequal burdens have been imposed on black students in the Tapley neighborhood (citing *United States* v. *School Dist. of Omaha,* 521 F.2d 530, 546 [8th Cir.], cert. denied, 423 U.S. 946 [1975]; *Arvizu* v. *Waco Ind. School Dist.,* 495 F.2d 499, 504-507 [5th Cir. 1974]; *Lee* v. *Macon County Bd. of Educ.,* 448 F.2d 746, 753-754 [5th Cir. 1971]), points out that, as Tapley was integrated, to move students otherwise destined for Tapley to Brightwood Community School entails placing them in a less favorable racial or ethnic environment. QIEC also says that with Tapley closed except for kindergarten, the children left there in kindergarten, mostly black, are in effect segregated. However, Tapley was inadequate for grades 5-6, and a replacement facility is to be provided. Without grades 5-6, the kindergarten may be poorly placed at Tapley, but whether or what short-range measures should be taken was not developed at the hearings.

[26] There is argument, now, that the School Committee's expression of willingness to implement its recommendation was tantamount to approval of a plan, and that the verbal differences should be overlooked. But it must be counted strange that the School Committee, if indeed it intended to evince approval of a plan, should have failed to do the formally correct thing after it had received a warning from the At-

Assuming, however, that that recommendation may be regarded as the School Committee's plan for 1976-1977 (i.e., as proposing to continue the 4-6 grade pattern allowed for 1975-1976), we disagree with the School Committee's idea that the State Board could only review the plan for "balance" to the exclusion of such a subject as reduction of minority isolation. We deal here with an existing, working, comprehensive plan for the school system of the city of Springfield previously approved by the State Board and the court. The plan had to be modified to take in a new facility having "ripple" effects on the system. To be sure, the modification must achieve balance. But a modification producing the proper mathematical relationship could still be unacceptable. For example, it might be out of harmony with the rest of the system, or produce balance by foisting a bizarre or educationally absurd or damaging grade structure on one or more schools, or fail to recognize or prepare for a clearly discernible demographic shift. The statute, after all, calls for a plan and not a shambles. We think the State Board has a superintendency and responsibility here;[27] further, we think the court, when subjecting a plan

torney General following an earlier admonition by this court. (For the tactical reasons why the School Committee might deliberately omit to approve a plan, see *Springfield II,* 365 Mass. at 224-225.)

If Recommendation No. 3 is dealt with as a "plan," it remains unclear whether the School Committee put it forward as a plan for 1976-1977, the period chiefly in question, for it harped on the point that, after settling the arrangement for 1975-1976, the State Board should have remitted the issue of 1976-1977 (and later years) to consideration in connection with the long-range plan still to be forthcoming from the School Committee under the long neglected long-range order of October 12, 1973.

[27] In addition, compare G. L. c. 15, § 1G, inserted by St. 1965, c. 572, § 2, stating that the State Board "shall see to it that all school committees comply with all laws relating to the operation of the public schools and in the event of noncompliance the commissioner of education shall refer all such cases to the attorney general of the commonwealth for appropriate action to obtain compliance." The "laws" referred to would seem to include the State and Federal Constitutions and G. L. c. 76, § 5, as amended through St. 1973, c. 925, § 9A, by which "[n]o person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex,

to judicial review, could, in an extreme case, find a plan "arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law" (see G. L. c. 15, § 1J), even though it provided "balance."[28] Concluding on this point, we observe that, contrary to the School Committee's present claim that racial balance is the State Board's sole proper concern, it never challenged the State Board's authority to issue the long-term order of October 12, 1973, looking to the preparation of plans to alleviate minority isolation.

As to the School Committee's contention that the State Board must disregard possible constitutional infirmities in a proposal when it takes administrative action on it, the School Committee perhaps makes an improper inference from *Springfield I,* 362 Mass. at 432, where we said that the State Board should not have caused a cutoff of funds from Springfield on its own decision that the School Committee had acted unconstitutionally, and that the Board should first have sought a court declaration. In the present case the State Board is seeking the judgment of the court to confirm its administrative decision. Not only is the State Board not barred from considering the factors bearing on the constitutionality of a plan submitted to it for approval; it is bound to do so, although the ultimate decision of such questions is for the court on review of the administra-

---

religion or national origin." (For "town" as including "city," see G. L. c. 4, § 7 [34].) See text above n.29.

[28] There is an additional consideration. Without a modification of the existing decree, a plan for the Brightwood Community School for 1976-1977 could not go forward. This court could and would insist that any modification be fair and equitable. Considering the background, this must mean a modification well designed to relieve minority isolation; and in this connection the court would attribute the usual weight to the administrative determination. Here we follow the thought of the three Justices in *Springfield III,* 366 Mass. at 337-338. They said through Justice Quirico that notwithstanding a change of legislative policy declared by St. 1974, c. 636, the court should decline to vacate the decree approving the Six District Plan because the practical effect of doing so would be inequitable. More readily do considerations of equity suggest approval of a modification of that decree in the terms sought by the State Board. (The State Board noted the pertinence of this approach, citing Justice Quirico's opinion.)

tive action. See *Selectmen of Framingham* v. *Civil Serv. Comm'n,* 366 Mass. 547, 554 (1974). In its opinion of August 18, 1975, the State Board noted that it was calling on the Attorney General to take to the court the whole matter of the legality of the plan as approved by it. The School Committee protests that under a provision of G. L. c. 15, § 1G (see n. 27), the proper course for the State Board was to ask the Attorney General to bring a separate action to test issues of constitutionality, but that seems directed to cases where others need to be brought to book for acting unconstitutionally, and not to a case where the action of the State Board itself is under review; and in all events the State Board is represented by the Attorney General in the present lawsuit.[29]

(b) Addressing itself more generally to the substance of the plan for 1976-1977 as envisioned by the State Board's order of August 18, 1975, the School Committee objects that the State Board did not accord sufficient respect to its proposal (essentially the 4-6 grade structure and consequences) which should be taken to represent the community's judgment or desire arising from a knowledge of local conditions. The record shows that full attention was paid to the School Committee's submission, which is to say that the School Committee had ample opportunity, of which it availed itself, to put its case, and that the hearing officer and the State Board were not disdainful or disregarding of the local proposal, and analyzed it with care. In the result, the State Board disagreed — though only in part — with the School Committee, but the difference was reasoned and principled.

(c) The School Committee contends that this court should override the State Board's decision as being unsupported by the evidence or arbitrary or capricious. Our function in this regard is not to see whether, substituting ourselves for the State Board, we would come to the same

---

[29] The School Committee seems itself to have compromised with its reading of § 1G by praying in its counterclaim for appointment of a master (see n. 2 above).

result. We are rather to inquire whether the record discloses an adequate basis for the State Board's determination, as in *Springfield II*, 365 Mass. 215 (1974), and *School Comm. of Boston* v. *Board of Educ.*, 364 Mass. 199 (1973). We hold that it does, and refer to the discussion in point 4 above. We do not find it necessary or appropriate to decide whether the School Committee's proposal was unconstitutional, since the State Board's decision is supported independently of that matter. At the same time we can express agreement with the proposition that an administrative agency such as the State Board, should, like a court, avoid not only action that is unconstitutional, but action that is of dubious constitutionality.

(d) In closing, we express the hope that the School Committee and the State Board will move by agreement rather than protracted lawsuits toward the evolution of the Six District Plan. It must be recognized on all sides that the courts are not the proper place for the resolution of step by step modifications of the plan.

6. *Disposition.*   The case is remanded to the county court. The single justice shall enter a final judgment in substance (a) affirming the State Board's order, and (b) dismissing the counterclaim.

*So ordered.*